HEIRS OF CABRERA ET AL., PLAINTIFFS AND APPELLEES, *v.* APONTE, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Ponce in an Action of Debt.

No. 2225.—Decided July 28, 1921.

CONTRACT—INSANITY—INCAPACITY—EVIDENCE.—Contracts made by persons who are incapacitated because of insanity are null and void. When a person who has been adjudged incapacitated by a court on a showing of mental alienation enters into a contract the mere presentation of the judgment is sufficient to obtain an annulment of the contract, for that judgment is *prima facie* evidence of the incapacity of the person; but that evidence may be rebutted by other clear and strong evidence showing that in fact the person adjudged incapacitated was in the full enjoyment of his mental faculties when the contract was made.

The facts are stated in the opinion.

Messrs. *López de Tord* and *Zayas Pizarro* for the appellees.

Messrs. *José A.* and *Alberto S. Poventud* for the appellant.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is an appeal from a judgment against the defendant

for the sum of $14,500, with legal interest from March 14, 1910, until full payment is made, the defendant also to render an accounting of the profits of a certain rural property from January 21, 1901, to March 14, 1910. The basis of this judgment is that the property referred to was acquired by the defendant from the predecessor of the plaintiffs who at the time of the conveyance had been adjudged incapacitated because of insanity.

In suing for the annulment of the conveyance made by their said predecessor in interest, María Mercedes Cabrera, her heirs alleged in the complaint not only that she had been adjudged incapacitated because of insanity, but also that she was actually insane when she made the conveyance and continued so until her death, and that the defendant knew of her demented condition.

In explanation of why they did not bring an action of ejectment against the present possessor of the property the plaintiffs alleged that the defendant, who had the property recorded in his name in the registry, sold it to Carlos Toro Labarthe for the sum of $14,500; that Carlos Toro Labarthe sold it in turn to the Santa Isabel Sugar Company, the present possessor, and that Toro Labarthe and the Sugar Company did not know of the defect in the title of Aponte.

The defendant answered denying the allegations of the complaint and pleading eight defenses, to wit: 1, that he purchased the property by public deed and for a sufficient price which he paid, the notary certifying to the capacity of the parties and the grantor, who on several occasions thereafter ratified the sale, being actually of sound mind; 2, that even supposing that the grantor had been incapacitated, her incapacity ceased when she contracted marriage on July 14, 1900; 3, that even admitting that the grantor had been incapacitated by insanity, the fact is that she signed the deed during a lucid interval; 4, that the defendant purchased the property from the person in whose name it was recorded

in the registry and the record did not show the mental incapacity of the grantor, nor did the defendant have personal knowledge of such incapacity; 5, that the proceeding wherein the grantor was adjudged incapacitated lapsed by inaction for more than four years; 6, that the plaintiffs and their predecessor were guilty of laches in allowing more than sixteen years to elapse before bringing the action; 7, that the action for the annulment of the contract is barred after four years have elapsed; 8, that in any event the defendant has acquired the property by prescription, because he has held possession of it as owner peaceably, publicly and uninterruptedly, in good faith and with colorable title, for a longer time than that required by sections 1858, 1861, 437 and 450 of the Civil Code and the Judicial Order of April 4, 1899.

The case went to trial. Voluminous documentary, expert and oral evidence was examined and the court finally rendered the judgment to which we have referred.

In support of the judgment the court handed down an opinion wherein it was found that María Mercedes Cabrera died in Ponce on May 30, 1913, from chronic meningo-encephalitis, according to a medical certificate, her heirs being the plaintiffs; that she suffered from dementia and for that reason was adjudged incapacitated by an order of court of March 4, 1899, she having died in a demented condition; that she was the owner of the property to which the action refers and in January, 1901, she and her husband sold it to the defendant for the sum of $1,700 and neither the notary who attested the deed nor the defendant knew that the grantor was not of sound mind, and that in 1910 the defendant sold the property for the sum of $14,500 to Toro Labarthe, who in turn sold it to the Santa Isabel Sugar Company, the said purchasers having no knowledge of the insanity of María Mercedes Cabrera.

By virtue of the foregoing findings from the evidence the element of fraud imputed to the defendant in the complaint

was eliminated, it being, therefore, necessary to start from the premise that it was shown that when the defendant made the contract he had no knowledge that the person who sold the property to him was suffering from mental alienation.

The court said:

"The principal question in this case is whether or not at the time of the execution of the deed of sale by María Mercedes Cabrera y Martorell in favor of Manuel Aponte y Cintrón the said grantor was incapacitated. Most of the evidence offered by both parties, consisting of documentary and oral evidence and the testimony of medical experts, bore upon this point. The evidence in this regard was very contradictory and after a lengthy and careful examination of it the court honestly and frankly must say that it has been unable to adjust the conflict in a satisfactory manner. In other words, the court has been unable to conclude whether or not María Mercedes Cabrera Martorell executed the deed of sale in favor of defendant Manuel Aponte y Cintrón during a lucid interval. But one of the very important facts proved at the trial was that María Mercedes Cabrera y Martorell was adjudged legally incapacitated according to law by a judgment of the Court of First Instance of Ponce of March 14, 1899, and it was not shown at the trial that she was thereafter rehabilitated or adjudged capacitated according to law. Under these circumstances the court is of the opinion that perfect application can be made to this case of the jurisprudence laid down in the judgment of the Supreme Court of Spain of October 21, 1897, 82 *Jurisprudencia Civil,* 491 to 496. That case was very similar to this, the only difference being that the property sold had not passed into the possession of a third person, for which reason only an action for the annulment of the sale could be brought. The said judgment of the Supreme Court of Spain contains the following: 'The second ground is absolutely untenable, for it is evident that in 1885, as now, adjudications of incapacity could be and can be made summarily, according to sections 1848 of the Law of Civil Procedure and 218 of the Code, when there is no controversy, and that *when made they are effective until revoked in a lawful manner;* for which reason the incapacity of the brothers Antonio and Juan González having been adjudged at that time, it is clear that they could not validly enter into the contracts in question in 1892.' From that jurisprudence it is necessary to conclude that inasmuch as it has not

been shown that the judgment of incapacity against María Mercedes Cabrera y Martorell, entered by the Court of First Instance of Ponce on March 4, 1899, has been revoked in a lawful manner, she could not validly enter into a contract of sale in the year 1901 in favor of defendant Aponte, unless she had been represented by her guardian.''

It is seen, therefore, that the decisive ground on which the district court sustained the complaint was the jurisprudence of the Supreme Court of Spain laid down in the judgment of October 21, 1897. Let us review that decision.

In 1885 Antonio and Juan González Higuera acquired several properties by inheritance and in the same year their brother Francisco brought proceedings to have a court declare the incapacity of the said Antonio and Juan and appoint him as their guardian. The court adjudged their incapacity and appointed the guardian who took charge of and cared for his said incapacitated brothers until the time of his death on April 1, 1892.

On July 23, 1892, the said Antonio and Juan went before a notary public, who certified to their capacity, and sold certain properties to Manuel González. The grantee did not pay a fixed price in money for the properties, but assumed the obligation to provide food and clothing for the grantors while they lived, he being forbidden to alienate the properties while the grantors were alive. The incapacity of the grantors did not appear from the registry of property and the sales were recorded.

At this stage, in August, 1892, a family council was called for the brothers Antonio and Juan, a guardian was appointed for them and forthwith the said guardian brought an action for the annulment of the sales, the cancelation of the records thereof in the registry and the restoration of the properties, without any restitution by the incapacitated brothers because they did not profit by the transaction.

The defendant answered ''that he denied the incapacity

of the González Higueras brothers with all its consequences, and that until it should be shown that they were actually incapacitated at the time of the execution of the said deed wherein the notary and the witnesses declared to the contrary, he would oppose the despoliation of which it was sought to make him the victim.''

At the trial the court considered not only the proceedings for a declaration of incapacity, but also expert and other testimony, and an examination was made by three physicians and afterwards by the judge. Judgment was rendered as prayed for by the guardian. The case was finally appealed to the Supreme Court of Spain and the judgment was affirmed. The paragraph containing the pertinent jurisprudence is copied into the opinion of the trial judge, but omitting the last part thereof which reads as follows:

"  *  *  *  much more so when it appears from the unanimous testimony of experts and even from the observation of the court that the said incapacity actually exists and that it is the result of permanent causes which prevent them from giving the free consent necessary for the validity of obligations, for which reason the said allegation is also untenable."

The foregoing is sufficient to show at once the just connection between the facts and the law in the case decided by the Supreme Court of Spain. The action was brought in favor of the incapacitated persons themselves. A very short time elapsed between the making of the contract and the action for its annulment. And the court not only applied the principle that the incapacity had been adjudged by a court, but from the unanimous testimony of experts and from its own observation ascertained that the incapacity existed and, what is more important still, that it was due to *permanent causes*. As we shall have occasion to see, the case now submitted to our consideration is quite different as regards the facts, but if the cases could not be distinguished and if the

judgment of the Supreme Court of Spain should be construed as laying down absolutely the strict rule that when the incapacity has been adjudged by a court, whether or not it is due to permanent causes, such incapacity should be considered as established and can not be controverted in an action and that any contract made by a person adjudged incapacitated should be considered void, regardless of whether or not the person was actually incapacitated at the time of its making, then we should be compelled to say that we do not agree with that jurisprudence. The actual state of facts must prevail. The declaration having been made, there is the *prima facie* presumption of the incapacity, but that presumption can be destroyed in proper cases with clear and strong evidence which may convince the court to the contrary.

The American jurisprudence on the matter is much more abundant than the Spanish. Ruling Case Law summarizes it as follows:

"The old doctrine of the English courts that a person would not be permitted to stultify himself by pleading his own insanity to avoid a contract which he had made, has been uniformly rejected in this country, and, in fact, some of the American courts have gone to the other extreme and have held that the contracts entered into by an insane person are absolutely void. This view is based on the idea that if the person be insane, he has no intelligent will to exercise and that, therefore, the element of assent to the agreement is lacking. According to the great weight of authority at the present day, however, the contract of an insane person made prior to an ajudication of his insanity and the appointment of a guardian is regarded as voidable only and not void. Contracts made by an insane person after he has been regularly adjudged insane are generally held to be absolutely void, the inquisition of insanity being regarded as notice, actual or constructive, to all the world of the fact of insanity. There are, however, decisions to the effect that such contracts are but *prima facie* void, and that the adjudication is not conclusive evidence of insanity. So also it has been held that the contract of the insane person made after inquisition is not void, but merely voidable, if the guardianship has been practically

abandoned, or no guardian appointed, or the guardian has resigned without the appointment of a successor." 14 R. C. L. 582–3.

For a fuller consideration of the matter see the note to *Flach* v. *Gottschalk Company,* 71 A. S. R. 425.

The rule generally applied by the American courts has been, therefore, to distinguish a case in which incapacity has not been adjudged from one in which it has been, considering the contract in the latter case absolutely void. But the actual state of facts has predominated on many occasions and a spirit of justice has prevailed, permitting inquiry into the facts in order to decide the particular case under consideration in accordance therewith.

It was held by the Supreme Court of Georgia in the case of *Field* v. *Lucas,* 68 Am. Dec. 465, and by the Court of Appeals of South Carolina in that of *Sims* v. *McLure,* 70 Am. Dec. 196, that contracts entered into by insane persons after inquisition and adjudication of incapacity are *prima facie* void, the inquisition not being conclusive evidence of insanity.

In the Georgia case the trial court refused to admit evidence of capacity because incapacity had been adjudged already and a guardian appointed for the incapacitated person. The Supreme Court reversed the judgment appealed from and said in its opinion:

"While the letters of guardianship remained unrevoked, was it competent for the defendant to show that the lunatic was capable of contracting? The authorities are in conflict upon this point. In the different states of this country it is provided by statute that upon representation or request idiots, lunatics, drunkards, and other persons of unsound mind may be put under guardianship; and in such cases the finding of the fact of lunacy by a competent court, and the appointment thereby of a guardian, is conclusive evidence of unsoundness of mind so as to render all contracts subsequently entered into by the lunatic void: *Leonard* v. *Leonard,* 14 Pick. 280; *McDonald* v. *Morton,* 1 Mass. 543; *Fitzhugh* y. *Wilcox,* 12 Barb. 235; *Wadsworth* v. *Sherman,* 14 Id. 169; *L'Amoureux* v. *Crosby,*

2 Paige, 422, (22 Am. Dec. 655); unless in cases of absolute necessaries supplied to the lunatic under special circumstances: *McCrillis* v. *Bartlett*, 8 N. H. 569. But the authorities do not agree even in this country. In *Hart* v. *Deamer*, 6 Wend. 497, it was held that an inquisition taken under a writ *de lunático inquiriendo* is admissible though not conclusive evidence to prove the lunacy of an obligor in an action of debt on bond. And Chief Justice Savage, who delivered the opinion of the court, referred to the cases of *Baley* v. *Bates*, 8 Johns. 186; *Jackson* v. *Gilchrist*, 15 Id. 98; *Van Cleef* v. *Fleet*, Id. 147; and said many more might be added in which inquisitions had been received as competent though not conclusive evidence. So in the matter of *Gangwere's Estate*, 14 Pa. St. 417 (33 Am. Dec. 554), the court held that an inquisition of lunacy, finding the party a lunatic without lucid intervals, is *prima facie* evidence, but not conclusive; and that even a petitioner for the proceeding, who was a witness also, is not estopped from asserting the truth against it, and showing that the party had lucid intervals. And in *Hutchison* v. *Sandt*, 4 Rawle, 234 (26 Am. Dec. 127), it was held that one of the inquest himself was not estopped, and that the finding was persuasive evidence only.

"In *Hopson* v. *Boyd*, 6 B. Mon. 296, the court held that an inquisition of lunacy is only *prima facie* evidence against strangers, and is entitled to but little weight in Kentucky, unless it find the subject to be an idiot from birth. The same doctrine is maintained in *Doe ex dem. Aber* v. *Clark*, 10 N. J. L. 217, namely, that an inquisition of lunacy is not conclusive against any person not a party to it, and that when admitted in evidence, the party against whom it is used may introduce proof that the alleged lunatic was of sound mind at any period of time covered by the inquisition.

"In England the rule is considered as well settled by Mr. Shelford in his work on lunacy, page 290, and by Mr. Story in his treatise on contracts, that an inquisition only creates presumptive evidence of lunacy as to third persons. See also *Sergeson* v. *Sealey*, 2 Atk. 412, 413; Collison on Lunacy, 389, sections 1–3; *Faulder* v. *Silk*, 3 Camp. 126; *Ex parte Barnsley*, 3 Atk. 184; *Hall* v. *Warren*, 9 Ves. 605; 2 Madd. Ch. 738; *Lowe* v. *Jolliffe*, 1 W. Black, 365.

"Some of the courts (see *Leonard* v. *Leonard*, 14 Pick. 280) in this country state, the reason for the English rule does not apply here. We are unable to satisfy ourselves of the truth of this assumption. While we appreciate the evils, not to say the great in-

conveniences, that must result from not holding the judgment of the ordinary conclusive until the letters of guardianship are revoked, still, as the doctrine appears to be well settled in England, and our own courts are divided, we think it safest, perhaps, to hold that the inquisition is not conclusive upon third persons not parties to it; still we must say that it should require the clearest and most satisfactory proof that the alleged lunactic was of sound mind, and had been fairly dealt with in a contract made with him at a period of time covered by the letters of guardianship. For myself, I am free to say that I am not entirely content with the judgment, and I know not that my colleagues have come rather reluctantly to this conclusion. Perhaps the Legislature would do well to intervene upon this subject." 68 American Decisions, 466–68.

See also the following cases: *Johnson's Committee* v. *Mitchel et al.,* 142 S. W. 675; *Witty* v. *State,* 153 S. W. 1146, and *Taylor* v. *Taylor et al.,* 93 N. E. 9.

Another line of authorities represented by the courts of Texas and Minnesota has accepted as a rule that when the adjudication of insanity is made and a guardian appointed contracts entered into by the person adjudged incapacitated are void, but where the guardianship has been practically abandoned they have held the rule does not apply and the matter should be decided in accordance with the actual facts. Thus in the case of *Thorpe* v. *Hanscom,* 64 Minn. 201, the Supreme Court of Minnesota, speaking through Chief Justice Start, said:

"The law as to the contracts, including deeds and mortgages, of an insane person, is well settled. The deed of an insane person not under guardianship is not void, but only voidable, but while he is under actual and subsisting guardianship he is conclusively presumed incompetent to make a valid contract concerning his property, though in fact he is sane at the time of making the same. This rule is based upon convenience and necessity, for the protection of the guardian, and to enable him properly to discharge his duties as such. Without this rule it would be difficult, if not impossible, for the guardian to execute his trust, for in every action concerning the property of the ward he might be obliged to go before the jury

upon the question of the ward's sanity, and one jury might find one way and another the other way. Leonard v. Leonard, 14 Pick. 280; 2 Greenleaf, Ev. Sec. 371. Now, when the reason for the rule does not exist, the rule does not apply. Hence, if there is in fact no actual and subsisting guardianship, but the same has been practically abandoned, and the person who had been under guardianship after such abandonment makes a deed at a time when he is in fact of sound mind, and the contract is fair, the deed will be enforced, though the guardian has not been discharged by any judicial action. Elston v. Jasper, 45 Tex. 409.

"The evil and injustice of holding void the deed or contract of a person placed under guardianship during his insanity, made after the guardianship had been in fact abandoned, and when he was of sound mind, are emphasized by the facts of this case, where the defendant was in fact sane, and in the possession of his property, engaged in business as a merchant, also in buying and selling real estate, and foreclosing his mortgages, for some three years before the mortgage in question was made, without any objection or assertion of his rights by the guardian. To permit the defendant under such circumstance to repudiate all of his contracts and transactions during those years, simply because his guardian had not been formally discharged by the court, would be a travesty on the administration of justice. It is true that the trial court did not in express terms find that at the time the mortgage was made there was in fact no subsisting guardianship, and that the same had been practically abandoned, but such is the necessary inference and conclusion from the evidentiary facts actually found. It follows that the mortgage having been made after the guardianship had in fact terminated and been practically abandoned, and at a time when the defendant was of sound mind, it is valid." *Thorpe* v. *Hanscom,* 64 Minn. 205–206.

The adjudication of mental incapacity was made in this case on the ground that the then Miss Cabrera was suffering from *circular insanity.* This is a curable disease. At least all of the experts who testified at the trial and the authorities on the subject agree that persons suffering from that class of insanity have lucid intervals of days, of months and even of years, during which they are perfectly rational. This

being so, and the incapacity not being due to *permanent causes,* there is still greater reason for applying the rule permitting evidence of capacity notwithstanding the prior adjudication. Furthermore, that was the position taken by the plaintiffs themselves and that was the theory developed at the trial. The plaintiffs did not limit themselves to offering in evidence the proceedings for incapacity. They called witnesses and experts and exhibited documents to show that the incapacity existed at the time of the making of the contract which they sought to have annulled, and they did not object to the introduction by the defendant of evidence tending to show capacity.

On another hand, the evidence shows so clearly that the guardian did nothing to protect the person and properties of his ward that the case could be considered as falling within the exception established by the courts of Minnesota and Texas.

Having arrived at the foregoing conclusions, what action should we take? Is it proper to remand the case to the district court where it originated for decision after adjusting the conflict in the evidence, or, having before us the necessary elements, should we render such judgment as is proper after examining and weighing the evidence ourselves? The trial judge has been substituted by another who would be in the same position as we are, and in the former event the matter would be unduly delayed and perhaps another appeal to this court would have to be granted and we would then be bound to analyze the evidence. Both parties had their day in court and the record shows an ample defense of the interests involved. The case was decided finally and in accordance with the law this appeal was taken. Under such circumstances we are of the opinion that we should definitely dispose of the case without further delay.

The evidence covers more than three hundred pages. The plaintiffs introduced the declaration of heirship, copies of

the deed sought to be annulled and of the posterior transfers of the property, the proceedings for the incapacity of María Mercedes Cabrera, a certificate of her death, the testimony of ten witnesses and the testimony of three medical experts.

The proceedings for incapacity were begun on January 20, 1899, by Carmen Cabrera Rodríguez, an aunt of María Mercedes. Accompanying the petition was a certificate of Doctor Villaronga to the effect that María Mercedes "has for a long time been suffering from mental alienation of the type known as circular insanity" and another of Doctor Chacar to the effect that she has been "suffering from a hypochondriacal vesania with frequent psychical disturbances, especially of the will, having some remissions of short restorations." The court appointed as experts Doctors Amadeo and Salicrup and the family council appointed Dr. Villaronga. The experts agreed that María Mercedes "is suffering at present from mental alienation of the type of circular insanity with periods of excitation and depression." The family council reported in favor of the adjudication of incapacity. The judge personally examined María and asked her "innumerable questions which she answered incoherently, accompanying her words with a kind of smile that had no connection with the conversation and displaying a lack of memory for facts which she should have easily remembered," and on March 4, 1899, an order was entered adjudging her incapacity. The family council appointed Pedro M. Descartes as her guardian and the appointment was recorded in the registry of guardianship of the court on the 24th of the same month.

The testimony of the witnesses for the plaintiffs may be summed up as follows: They knew María Mercedes and in their opinion she was insane. She would go out in ragged clothes with her hair uncombed. She tore her clothes to pieces and pulled her hair. She changed the matter of conversation. She laughed and yelled without cause. While

speaking she said irrelevant things. She uttered indecent words and sometimes went out almost nude. Sometimes they kept her locked in. She cried without cause, and according to her cousin Julia, one of the plaintiffs, she said she was "the mother of the fleas." The testimony of the witnesses referred generally to a short time before and after the proceedings, but some of it referred to dates after María Mercedes had married and had executed the deed.

On direct examination by the plaintiffs Dr. Villaronga merely confirmed the fact appearing from the death certificate, that is, that María Mercedes died as a result of chronic meningo-encephalitis, adding that the said disease was "the actual anatomical substratum of general progressive paralysis." Doctors Ferrán and Pérez Marchand testified in rebuttal and we shall refer to their testimony hereafter.

The defendant introduced the protocols containing the original deed of sale, the assignment of the mortgage and the notice to the mortgagor of the assignment, with the authentic signatures of María Mercedes. Photographs of these were made and brought up to this court.

The defendant also introduced a certificate of the marriage of María to Salvador Valls on July 14, 1900, by the Municipal Judge of Ponce before witnesses; another certificate showing that the incapacity of María Mercedes was not entered in the book of incapacitated persons in the registry, nor in the general books thereof; a certified copy of a motion of insolvency subscribed and sworn to by María Mercedes in an action of divorce brought by her in 1907, and also the deed of sale with a note showing that it was recorded in the registry on March 16, 1901.

The defendant's witnesses testified to various facts. In a general way many of them testified that they knew María Mercedes before and after her marriage and did not notice anything about her which led them to the conclusion that she was insane, but, on the contrary, in their opinions she

was of sound mind. Some of them referred to an incident which occurred during the Spanish-American war. The Descartes family, of which María was an orphan member, lived in the country. Somebody said that the soldiers were coming in pursuit of Mr. Descartes and all the family ran and hid in a lime-kiln. María was greatly frightened. . She became gloomy. She would sit down to knit and soon begin to cry. This condition continued for about a year.

Other witnesses testified about María's marriage. The guardian was absent, the family opposed it and she went away with her fiancé in a carriage. They went to look for the god-mother, an aunt of María's who did not live at the same house, and then all of them went to the court. María conducted herself well through all this.

Juan Santiago testified that he knew María before and after her marriage. Before she was married she used to go to a store which the witness kept in the ward of Descalabrado, Santa Isabel, near the house of Descartes, where she talked with him and he observed nothing abnormal about her. After she was married she went to see him for the purpose of offering him the Cercado de María property for two thousand dollars and the witness refused the offer. He never knew that she was insane or that she had been adjudged insane. He learned later that Aponte, the defendant, had bought the property.

Luis Casals testified that before her marriage María Mercedes on several occasions commissioned him to collect the rents on her property and gave him receipts written by her. She expressed herself correctly. He saw her after she was married and in his opinion she was well. In connection with these rents there were introduced in evidence three letters written by María Mercedes in 1896 to her lessee asking for an increase of the rent and saying that other properties in the same ward produced more, mentioning other facts.

The testimony of Manuel Vidal Sánchez, a notarial clerk,

refers to facts which occurred at the time of the execution of the deed and prior thereto. He said that before her marriage María Mercedes personally commissioned him to look for her inheritance schedule in the estate of her father. The witness described in great detail the act of the execution of the deed and represented María Mercedes as acting in every respect like a person of sound mind, explaining that he could remember this because he had worked for María and had fallen in love with her and therefore could not easily forget her.

Two of the witnesses to the deed testified. One of them, Elías Concepción, said: "I was one day in the office of the notary attending to some personal matters and I knew this lady (referring to María Cabrera) by sight and she asked me if I would do her the favor of signing the deed as a witness," and the other, attorney López de Tord, testified that he did not recollect that anything abnormal occurred during the execution of the deed.

There were also introduced in evidence the following letters written and signed by María Cabrera:

"Mr. Manuel Aponte.—Dear Sir: The object of this letter is to ask you not to deliver to anybody the money you are owing me, either at maturity or before; I mention this because things like this happen sometimes. If you come to Ponce some day and we have an opportunity to talk, I will explain in detail the reason for this.—Asking you to take this as confidential, for I do not want anybody to know about it, and for which favor I shall always be grateful to you, I remain, yours very truly, María Mercedes Cabrera.—Ponce, March 19, 1901."

"Mr. Manuel Aponte.—Dear Sir: For the second time I claim your attention in order to ask you earnestly not to make any transaction whatsoever with the money you owe me, not even with my husband, because I want to avoid being left destitute, as I told you before.—I again ask you to keep this secret; also please answer telling me whether you received another letter which I sent you by Román. You may address your answer as follows: Mrs. Rosario

Martorell, No. 17 Aurora St. In that manner it will come into my hands without anybody knowing of it.—I remain, yours very truly, María M. Cabrera.—Ponce, April 24, 1901.''

''Mr. Manuel A.—Dear sir and friend: This request will perhaps surprise you, but want and misfortune both compel me to write to you in the belief that your good heart will respond to my misfortune. Mr. Aponte, I do not know whether you are acquainted with the fact that I have been abandoned by the man whom I selected as my mate, and who under cover of hypocrisy deceived me; but I want to be brief and tell you in a few words what has happened to me: My property has been reduced to a small ruinous house without a kitchen, but fortunately I have found a kind man who has let me have a lot on which to put it, paying very little for it, and he always tells me not to worry about the rent. I have heard about you from different persons, and on the day that I had the pleasure of making your acquaintance, which was the day on which, to my misfortune, I had to abandon my property, although our conversation was very short I noticed your face and now remember it and no doubt you are worthy of the good fame you have, for your kindly face reveals a generous heart. I hope, Mr. Aponte, that you will heed my request and send me eight or ten dollars to help me repair this small house in which I have been compelled to live. It is five years since I married and four year since Salvador abandoned me, without sending me anything. And this, only because I caught him with his concubine, and, naturally, I told him what he deserved, and he left me and never came back. I do not want to bother you with my pitiful story; but if you come to Ponce some day please come around and you will see my distress yourself. My address is No. 19 Méndez Vigo Street.—I remain, respectfully and humbly yours, María Mercedes Cabrera.''

Considering as established the facts involved in the evidence introduced by him, the defendant questioned the medical experts, Doctors Villaronga, Salicrup, Salazar and De la Pila Iglesias.

Doctor Villaronga testified:

''My answer is that she was going through a lucid interval, but I can not be positive of it because I did not examine the person at the time. At that time she might have been in a lucid interval that

extended to the time when she wrote the letters, which are correct not only as to the meaning of their contents, but as to the mechanism of writing."

The plaintiffs then put the following question to him: "Doctor, it seems that from reading these letters written by María Cabrera you arrived at the conclusion that she was entirely lucid." And he replied: "I have said that it was possible." Afterwards the expert said: "It can not be affirmed nor denied that she was lucid without having made and examination at the time." The questioning was continued about the class of insanity and the doctor finally said that after considering the cause of her death, if he had to rewrite the certificate of 1899 he would not merely classify the insanity as circular, but as general paralysis of the circular type in its first stage. He said: "They are two distinct diseases. General paralysis is one disease and circular insanity is another, but the former can appear in the form of circular insanity, it being impossible to make a diagnosis of it until after the progressive evolution of the symptoms." He went on to give explanations and the plaintiffs asked him: "Is there degeneration of the cells?" The doctor replied: "Yes, atrophy; in the last stages the brain is atrophied."

The defendant again asked him: "Notwithstanding all you have said, are you of the opinion that María Mercedes Cabrera Martorell was enjoying a lucid interval on January 21, 1901, when she signed the deed?" He replied: "Considering the facts of this case, I shall always believe that she was * * *." "You can not say so positively?" "No, sir." "But, what is your opinion?" ".Yes, I believe she was sane." "Notwithstanding the fact that she suffered from meningo-encephalitis, is the witness of the opinion that at the time she signed the deed and these letters she was in a lucid interval?" "Yes, sir, absolutely, because remissions are characteristic of these diseases."

Doctor Salicrup, who was one of the physicians appointed by the court to testify in the proceedings for incapacity, said: "From the facts and the letters it appears that the patient was either cured or in a lucid interval. All these facts show that she was cured and I would not hesitate to give a certificate to that effect." "Are you of the opinion that at that time (referring to the time of the execution of the deed) she was of sound mind and was conscious of everything she was doing?" "Judging from those letters and her mode of expression, she was." He was asked if he would refuse to declare that she should be adjudged capacitated and answered: "Not at all, because I have to compare those facts with the examination that I made of the patient and of course I have to admit that she was cured or, at least, that she was in a lucid interval.

The doctor afterwards testified that meningo-encephalitis is not a disease exclusively suffered by the insane. He said that María Mercedes did not suffer from general progressive paralysis, but from circular insanity. The lucid intervals in this class of insanity may last for weeks and years. He was of the opinion that on January 21, 1901, María was "either in a lucid interval or of sound mind."

The plaintiffs then question him at length. They asked him hypothetical questions based on the situation described by their witnesses, that is, that she tore her clothes without any reason, pulled out her hair and tried to go out almost nude. He was asked: "What would you say about the condition of such a patient?" He replied: "I would say that after four years, more or less, she was in a lucid interval and was of sound mind   *   *   * ."

Doctor Salazar testified: "I am of the opinion that she was in the full use of her reasoning faculties and that she was responsible, inasmuch as the documents which have been shown to me show that she was of sound mind at that time *   *   * . From the letters I can only judge that she was

fully capacitated. If we consider, therefore, the facts as related in that question, I could assert that she had the full use of her mental faculties."

In answer to a question by the judge he said: "Yes, sir. We consider the mental disorder in that kind of insanity more as a psychosis than a disease. She could be considered as having the full use of her mental faculties."

In answer to a question by the plaintiffs he said: "According to the facts and the documents which have been shown to me, I am of the opinion that that young lady was responsible at that time (that of the execution of the deed), yet to diagnose with more certainty I would have tried to see what symptoms the patient presented." He urged the importance of the letters because they referred to the deed. In his opinion María Mercedes was not suffering from circular insanity or general progressive paralysis. His opinion was that she had "hysterical moments, periods of mania, after which she had a lucid interval and then another period of hysteria."

After repeated and insistent questions he concluded by saying that he would not in the least change his opinion and that he believed she was well.

Doctor De la Pila Iglesias said: "I am of the opinion that the person to whom the papers shown to me refer must be considered as of sound mind and in the full use of her reason, and may be considered as being completely cured. From this large amount of data regarding her intelligence and from all these details it is clearly seen that she was completely rational and had the full use of her mental faculties. From these three letters it is seen that she was in a perfect mental condition as to memory, perception, recollection, retrospective memory and subconscious memory."

The evidence for the defendant covered also the question of the real value of the property at the time of the sale and the acts of the grantee in connection with the contract. In our opinion it was fully demonstrated that the price paid

by the defendant was the fair value of the land at that time. Adjacent properties were sold for a similar proportionate sum. All of the circumstances show also that the grantee was absolutely ignorant of the adjudication of incapacity and contracted with a person who in the ordinary course of things may be considered as entirely capacitated. There is in the record a very interesting series of questions. López de Tord, attorney for the plaintiffs, was, as we have seen, one of the witnesses to the deed, and when Juan Cortada testified at the trial, in answer to the questions of López de Tord he insistently reminded the latter of the fact that he (Cortada) having loaned Aponte the money with which to purchase the property and being, therefore, desirous that Aponte should obtain a good title, gave him (Aponte) a letter of his (Cortada's) attorneys, Ortiz Antón and López de Tord, and this was the reason why the latter accompanied Aponte to the notary's office. Cortada said that Aponte "is at present the most honest employee of the Santa Isabel Company."

After the defendant had rested the plaintiffs called as witness doctors Ferrán and Pérez Marchand. They testified at length about the different kinds of insanity and the substance of their testimony is that in their opinion it can not be concluded whether or not María Cabrera was in the possession of her mental faculties when she executed the deed without having made a personal examination of her.

This is the evidence introduced by the parties in this case. We have examined it carefully and have weighed all of the attending circumstances, and in our opinion it is not sufficient to justify the annulment of the contract. The position of the plaintiffs was easy. They were in a condition to present, and did present without difficulty, a *prima facie* case of insanity. The position of the defendant was difficult. After all these years; after having acquired a property in the ordinary course of business from the person in whose name it was recorded in the registry without any defect or

limitation, employing the services of a good lawyer, in the open and before a notary, and having recorded his title without difficulty in the same registry; after having kept possession of the property for many years and having improved it, and after having sold it, he is confronted with the plea of the insanity of a person whom he knew only at the time of the transaction and is compelled to investigate the life of that person and prove her capacity, that is, to look into the mystery of the mind of a person who, making it all the more difficult, had already departed this life. But in our opinion he was successful. The adjudication of incapacity was not due to permanent causes. Circular insanity may be cured, or at least makes possible long lucid intervals during which the reasoning faculties work normally. If María Mercedes had been the person described by the witnesses for the plaintiffs—incapable of holding a conversation without raving, without memory, laughing or crying at every turn without cause—she could not have attended to the long and complicated acts in connection with her marriage and with the execution of the deeds of sale and assignments without displaying her condition to the judge, the notary and the witnesses. There is not a shade of doubt in this case regarding the conduct of the said officials in these acts.

Furthermore, Casals and the notarial clerk, Vidal Sánchez, describe María Mercedes prior to her marriage as personally attending to her own interests; searching for her inheritance schedule in the estate of her father; collecting the rents on her property, and trying to obtain an increased rent, all of which acts reveal a mind that had an exact perception of the facts and the situation; and witness Santiago, a neighbor of hers who knew her well, was offered the property by her in person after her marriage for the sum of two thousand dollars.

But there is still further evidence that tips the balance for adjusting the conflict. We refer to the three letters writ-

ten and signed by María Mercedes and directly connected with the contract sought to be annulled. She, the owner, the person who sold the property, remembered perfectly the details of the sale and took care of the purchase money. After several years had passed; wronged and abandoned by her husband and living in a miserable manner, she again thought of the purchaser of her only property, not to reproach him; not to deny the act, but on the contrary to remember his kind face and implore help of his generous heart. There are so many details in those letters; they show a mind so concentrated and firm, without any extravagance being observed in them, that it is impossible that they were written by a person not in the possession of her mental faculties.

Certainly María Mercedes was not a model of good health. Her parents, it seems, did not live long. The evidence of the defendant shows that for a period of one year about the time of the proceedings for incapacity she was in a condition that could be taken as a basis, as it was, for the adjudication of incapacity. But the cause of that incapacity was temporary. Her health could improve and her brain could react. And judging not only from the opinions of men, but more especially from her own acts; from the indelible wake of her acts in the exercise of her mental faculties, her capacity was sufficient, and to annul now a contract made by her in disposing of her property, not at her own instance but upon the petition of certain collateral heirs, made after the lapse of seventeen years, would amount to the perpetration of a tremendous injustice upon a grantee who acquired in good faith and paid a fair price for the property.

The judgment appealed from must be reversed and another rendered dismissing the complaint without costs.

*Reversed.*

Chief Justice Hernández and Justices Aldrey and Hutchison concurred.

Mr. Justice Wolf concurred in the judgment.