## Johnson's Committee v. Mitchell, et al.

(Decided January 24, 1912.)

### Appeal from Pike Circuit Court.

1. Deeds of Persons of Unsound Mind.—The contract of a person of unsound mind, like that of an infant, is not void, but is voidable only.

2. Same.—The fact that a person has been properly adjudged to be of unsound mind is conclusive evidence that such was his condition at the time of the inquest; but it is only prima facie evidence of his condition at the time of a subsequent sale and conveyance; and being a mere presumption, it may be repelled by oral testimony.

3. Same.—Although a grantor was of unsound mind at the time he executed a deed, that fact can not divest his grantee or the subsequent purchasers of title to the land unless they had, at the time of the conveyance to them respectively, notice that the original grantor was of unsound mind at the time he made the deed.

ROSCOE VANOVER and J. S. CLINE for appellant.

YORK & JOHNSON for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

On April 16th, 1890, James K. Johnson, of Pike County, was adjudged to be a person of unsound mind and a lunatic, in the Pike County Court, and was sent to the asylum at Lexington, Ky., for treatment. Johnson had a family consisting of a wife and five children, and he then owned about 800 acres of land in Pike County. He remained in the asylum at Lexington until August, 1895, when he was discharged and returned to his home in Pike County, without any inquest having been held to determine his sanity.

Subsequently, on January 30, 1897, Johnson conveyed a portion of his land to Timothy Mullins, and Timothy Mullins conveyed a portion of same to Charles Mullins and Floyd Mullins.

On February 9, 1897, Johnson deeded a portion of his land to the appellee, Gilbert Looney, who in turn conveyed the same to James Keen. Keen conveyed said land to J. M. Sanders; J. M. Sanders conveyed a part of said portion to L. D. Sanders, and J. M. and L. D. Sanders conveyed this original portion to Bud Castle, the present owner.

Again, on October 15, 1897, Johnson conveyed another portion of this land to James Tackett, who in turn conveyed the same to J. M. Sanders. The latter conveyed a part of this portion to L. D. Sanders, and L. D. Sanders and J. M. Sanders conveyed it to Bud Castle, the present owner.

On September 3, 1900, Johnson conveyed another portion of this land to Geo. W. Mitchell, and he conveyed the same to Reed S. Johnson. Reed S. Johnson conveyed said land to J. M. Sanders; Sanders conveyed it to Andy Sanders, and Andy Sanders deeded the same to A. J. Stewart, the present owner. In this last named conveyance by Mitchell, he retained the coal and minerals in the land, and subsequently sold and conveyed said coal and minerals on this portion of the land to the Northern Coal & Coke Company.

On January 21, 1901, Johnson conveyed another portion of this land to Sylvester Johnson, who conveyed the same to Daniel Newsom. Newsom conveyed it to Spurlock Coleman, the present owner.

On March 3, 1903, Johnson sold and conveyed the coal, minerals and other mining rights and privileges in another portion of this land to the Northern Coal & Coke Co., the present owner.

On January 1, 1908, Reed S. Johnson, a son of James K. Johnson, was, upon his own motion, appointed by the Pike County Court as the committee for James K. Johnson. This appointment was made by virtue of the original finding of lunacy in 1890, and without any additional inquiry into James K. Johnson's mental condition. Immediately after his appointment, Reed S. Johnson, as committee, brought these six suits against the vendees and the subsequent vendees of said James K. Johnson, including the present owners, for the purpose of setting aside said conveyances, upon the ground that James K.

Johnson did not have sufficient mental capacity to make any of said conveyances, and that he yet was of unsound mind. The defendants answered, denying Johnson's incapacity and unsoundness of mind at the time he made the conveyances. The six suits were consolidated and heard as a single case, and upon the hearing it was dismissed; and from that judgment the plaintiff prosecutes this appeal.

The law governing the case is well stated in Logan v. Vanarsdall, 27 Ky. Law Rep., 822, which was a case quite similar in character to the case at bar, and in which this court said:

"We do not agree with the contention of appellants, that the deed from James P. Terhune to Vanarsdall was void. It has time and again been held by this court that the contract of a person of unsound mind, like that of an infant, is not void, but voidable only. (Arnett's Committee v. Owens, 23 Ky. Law Rep., 1410; Breckinridge's Heirs v. Ormsby, 1 J. J. M., 236.)

"Assuming it to be true, as averred in the petition and as appears from the copy of the inquest of lunacy filed as an exhibit, that James P. Terhune was properly adjudged to be a person of unsound mind, that fact, though conclusive evidence that such was his condition at the time of the inquest, is only prima facie evidence of his condition at the time of the sale and conveyance to Vanarsdall or any subsequent period. Being a mere presumption it may be repelled by oral testimony. (Clark's Exor. v. Trail's Admrs., 1 Met., 35.)

"In the case at bar the sale and conveyance of the land by Terhune to Vanarsdall was made about two years after the time he was adjudged to be of unsound mind. Notwithstanding his mental unsoundness at the time of the inquest, he may have been of sound mind and altogether capable of contracting when he sold and conveyed the land to Vanarsdall, but this would have to be shown by proof. We can not anticipate what defense will be presented by the answer, but will say in passing that though it may appear that Terhune was of unsound mind at the time of the conveyance to Vanarsdall, that fact can not divest the latter's grantee, or the subsequent purchasers, of title to the land, unless they had, at the time of the conveyance to them respectively, notice that Terhune was of unsound mind at the time he sold and conveyed the land to Vanarsdall. (Arnett's Committee v. Owens, 23 Ky. Law Rep., 1410.)"

The appellees do not contend that they were ignorant of the former unsoundness of mind on the part of James K. Johnson during the time he was confined in the asylum, but they insist that he had been restored to his right mind, and was of disposing capacity at the time he made these several deeds between 1897 and 1903. We have before us, therefore, a simple question of fact, with the burden of proof upon the appellees, to show that Johnson had sufficient mental capacity to make the conveyances at the several times he made them. The case presents, in some respects, an anomalous, aspect, in view of the fact that Reed S. Johnson and Sylvester Johnson, sons of James K. Johnson, were the grantees in two of these conveyances which Reed S. Johnson, as committee, is now attacking. And in the deed to the Northern Coal & Coke Co., Reed S. Johnson and his wife joined his father as grantors.

A brief review of the evidence is sufficient to show that it fully sustains the ruling of the chancellor in dismissing the action. James K. Johnson never had much brightness of mind, but was below the average in ability, according to the testimony of Dr. Clarke, the superintendent of the asylum, and who had charge of him. To sustain his case, the appellant took the depositions of eight witnesses, including those of Dr. Clarke and Reed S. Johnson, the committee. Pickelsimer, the notary who took his acknowledgment in September, 1900, says Johnson was then of weak mind, although Pickelsimer did not hesitate to take and certify to the acknowledgment. McCown, who had known Johnson for fifteen years or more, says his mind appeared to be bad, from his talk. Looney says Johnson's mind seemed to be scattering; while Case said Johnson indulged in strange talk. Sylvester Johnson, the son, says his father's mind was not very good; that he had scars on his fingers, and that he claimed great things were due to that fact, or had been done by reason of the scars; and concerning the deed his father made to him in January, 1901, Sylvester says his father's mind was then about the same as it had been before.

The witnesses who say that Johnson's mind was weak or bad, base their testimony almost entirely upon his talk, in which he was at times apparently irrational, although some of the witnesses seem to think he was joking. The only specific language of this character attributable to Johnson was that he said "he had made

the world," and that he "spat upon the ground and it turned green." There is some evidence to the effect that Johnson used this language in a spirit of banter.

Upon the other hand, the defendants introduced thirteen witnesses, who testified that there was no material change in Johnson's conduct or apparent capacity after he returned from the asylum from what it was before he was adjudged insane in 1890; that he was as able to make a deed as he was before he was sent to the asylum, and that he had the mental capacity to know what he was doing when he made the several deeds complained of. He worked as an ordinary man, and although he did not trade in small stock as he had done before his removal to Lexington, the failure was accounted for by some of the witnesses upon the ground that his family had disposed of his small accumulated stock of animals and farming implements in their support while he was in the asylum, and that he thereafter had no capital to trade upon, for that reason. In making deeds he directed how they should be made, and gave the descriptions, including the lines and corners, as well as any ordinary person could do under like circumstances. And, on one occasion, according to the testimony of J. M. Sanders, Johnson took part in a "spelling bee." Furthermore, Sanders testifies that upon one occasion Reed S. Johnson told him that his father was capable of making the deed he had made to the Coke Company, but that he (Reed S. Johnson) "was using his influence against the deed in order to get the price raised." The other witnesses for the appellees testify that Johnson acted as an ordinary man, and they saw no reason to doubt his capacity to make the deeds. The strongest evidence in support of this view is found in the testimony of Robertson, John J. Johnson and James Sowards, who, having heard the talk about Johnson's former insanity, made a special examination of his mental capacity before the deed was made to the Coal & Coke Co. in 1903. They were in close communication with Johnson and observed him for several days, with the view of satisfying themselves as to the reports they had heard, and came to the conclusion that he had ample capacity to make the deed.

We are clearly of opinion that the evidence sustains the finding of the chancellor.

The judgment is affirmed.