# Wytheville.

## ANNIE WADDY, ROBERT WADDY, ET ALS. v. PRISCILLA GRIMES.

June 23, 1930.

Absent, Campbell, Holt and Hudgins, JJ.

The opinion states the case.

*R. O. Norris, Jr.* and *C. Harding Walker*, for the appellants.

*Wm. B. Sanders* and *Frank G. Newbill*, for the appellee.

EPES, J., delivered the opinion of the court.

This is a chancery suit brought in April, 1927, in the Circuit Court of Lancaster county, Virginia, by Priscilla Grimes, the daughter and one of the heirs-at-law of Fielding Grimes, deceased, against Annie Waddy and Robert Waddy, her husband, St. Paul Carter and Inez Carter, his wife, and Matthew Waddy, trustee.

The object of this suit is to set aside the following three deeds, all conveying a tract of land in Lancaster county, Virginia, containing fourteen and three-fourths acres of land, to-wit: A deed from Fielding Grimes to Annie Waddy, dated March 6, 1926; a deed from Annie Waddy and Robert Waddy, her husband, to St. Paul Carter, dated July 26, 1926, and a purchase money deed of trust from St. Paul Carter and wife to Matthew Waddy, trustee, dated July 26, 1926.

The grounds upon which these deeds are attacked are that the deed from Fielding Grimes to Annie Waddy was executed on March 6, 1926, when Fielding Grimes was insane and in a state of almost physical and mental imbecility from physical disease, and after he had been adjudged *non compos mentis* by an order of the Circuit Court of Lancaster county, Virginia, entered on November 20, 1925, appointing Robert Waddy, the husband of Annie Waddy, his committee, to which office Robert Waddy had qualified and in which he was acting when said deed was executed; and that the consideration paid therefor was grossly inadequate and said deed was procured by the fraud and undue influence of Annie Waddy and Robert Waddy.

All the defendants, except Matthew Waddy, trustee, answered the bill denying that Fielding Grimes was *non compos mentis* when he executed said deed and that said deed was procured by fraud or undue influence. The bill was taken for confessed as to Matthew Waddy, trustee.

On motion of the responding defendants the court directed an issue out of chancery and submitted to a jury the question: "Was Fielding M. Grimes on March 6, 1926, at the time he executed the deed to Annie Waddy, of sufficient mind and understanding to fully understand the nature and the legal effect of his act in executing said deed?"

The jury was unable to agree upon the question submitted to it. The complainant thereupon moved the court to revoke its order directing an issue out of chancery, and by its decree entered July 16, 1928, the court (to use the language of the decree) "being of the opinion that no matter what would have been the verdict of the jury on this issue that it would have decided that Fielding Grimes was incompetent to make

and execute said deed," revoked its order submitting said issue to the jury, and revoked and annulled all three said deeds. From said decree all the defendants appeal, making four assignments of error.

The second assignment of error relates to an instruction which the court refused to give to the jury. The third assignment relates to the refusal of the court, upon the failure of the jury to agree as to the mental capacity of Fielding Grimes, to impanel another jury and resubmit said issue to it. It is useless to discuss these two assignments of error, for in this case all the evidence presented to the trial court and the jury is certified and final decree must be here entered.

This is not a case in which any party was entitled as of right by any statute or rule of law to have an issue out of chancery submitted to a jury, as in a case involving the validity of a will (section 5295, Code Va.); but the submission of such an issue to a jury in a case like this rests in the sound discretion of the trial court, and the purpose of such submission is to inform the conscience of the court. Section 6246, Code of Virginia.; *Fishburne* v. *Ferguson's Heirs*, 84 Va. 87, 4 S. E. 575; *Catron* v. *Norton Hardware Co.*, 123 Va. 380, 96 S. E. 853.

The first assignment of error is that the court erred in setting aside and annulling the deed from Fielding Grimes to Annie Waddy.

The court in its decree sets forth the grounds upon which it revoked and annulled said deed as follows:

"The court being of the opinion that Fielding Grimes was, on the 6th day of March, 1926, at the time that he executed the deed to Annie Waddy, mentally incompetent to execute said deed; that the consideration paid therefor was grossly inadequate; that Robert Waddy, a duly appointed and qualified committee for Fielding

Grimes, was the real beneficiary in said deed, and for these reasons that the said deed was voidable."

Fielding Grimes was a negro man between fifty and sixty years old at the time here in question. He was of rather low mentality and always had been somewhat peculiar; but certainly up to a comparatively few months before he executed said deed to Annie Waddy he was legally capable of transacting business and looking after his own affairs. He had acquired many years before 1925 the tract of land on Corrottoman river, in Lancaster county, Virginia, containing fourteen and three-quarter acres, upon which he lived, which is the subject of this controversy. He also had at the time here in question three and three-tenth acres of excellent oyster ground very near the natural rock, and had his shore full of oysters.

For some years prior to the fall of 1925 he had lived alone on said tract of land. His wife had been long dead, and he had only two children, a son and a daughter, Priscilla Grimes. The son had not been heard from by his father for many years. His daughter, Priscilla, lived in Baltimore and seems to have paid little attention to her father. In August, 1925, she came to Lancaster county to attend the revival meetings, but though she knew that her father was sick she left him sick and alone and went back to Baltimore. In November, 1925, while he was ill at the home of Robert Waddy, his nephew, Priscilla Grimes came to see him but stayed only about thirty minutes. She did, however, send a message to Doctor Norris asking him to go to see her father. Beyond this there is no evidence of her having shown him any attention or affection or done anything for him, or having arranged to have any one else do anything for him, except the letter written to Robert Waddy soon afterwards; and

she was not present at his funeral, which in the case of the Virginia negro is not without significance.

Fielding Grimes had been, for some unknown length of time, suffering from chronic nephritis (Bright's disease); and in the spring of 1925 he had a slight stroke of paralysis.

According to the testimony of Robert and Annie Waddy, in June, 1925, Fielding Grimes went over to their home and spent the night. While there he told them that his children did not help him or pay any attention to him and that he had nearly died the winter before from lack of attention, and that if Robert and Annie Waddy would let him come there and live with them and take care of him as long as he lived he would deed his place to them. They told him they would do this, but he said that he did not want to come until in the fall.

On or about October 22, 1925, Mr. Brent, a justice of the peace in the neighborhood, heard that Fielding Grimes was in bad shape and lying helpless in the woods. He went to see about him and found him lying just outside his yard, apparently in a stupor; and called Dr. Oldham to attend him.

Dr. Oldham testifies that when he got there he found Fielding Grimes in a terribly dirty condition and ill from exposure and lack of nourishment; that he was suffering from chronic nephritis (Bright's disease); had had a slight stroke of paralysis, and was semi-conscious.

Having nowhere else to take him, Mr. Brent and Dr. Oldham took him to the county jail, and discussed having a commission of lunacy convened the next day if they found it necessary. The next day Mr. Brent arranged to hold a commission of lunacy over him and requested Dr. Oldham and Dr. Pierce to attend upon it; but Dr. Oldham advised Mr. Brent that Grimes was

not insane but suffering from exposure, lack of attention and nourishment, chronic nephritis and a slight stroke of paralysis, and the commission was not held.

Dr. Oldham testifies that at this time Fielding's mind was dull and confused, and he did not have the mental capacity to transact business, and that his mind was affected by the uremic poison in his system.

The morning after Fielding was taken from his home to jail, Dr. Oldham told his nephew, Robert Waddy, about Fielding's condition, and asked Robert to take him to his home and look after him. Robert came to the court house that day, saw Mr. Brent and Dr. Oldham, and agreed to take Fielding to his (Robert's) home and care for him. Mr. Brent says that the understanding was that Robert would be paid for his trouble, and that Mr. Brent would ask the court to compensate him.

Robert Waddy that day took Fielding Grimes home with him, cleaned him and purchased new clothing for him, and from then until Fielding Grimes died on April 7, 1926, Robert and his wife, Annie, kept Fielding Grimes at their home and supported, nursed and cared for him well, and to his comfort and satisfaction, as is shown by his statements to Dr. Oldham, Mrs. Blakemore, and Mr. Davenport.

Dr. Oldham went down to see him at Robert Waddy's and left some medicine for him to remove the posion from his system; and then did not see him again until in January, 1926, though at various times he sent him medicine to take.

Some time in November, 1925, Priscilla Grimes came down from Baltimore to see her father at Robert Waddy's and stayed with him about half an hour. At the time of this visit she sent a message to Dr. M. E.

Norris asking him to go to see her father. This was the only visit she paid him after he was taken to Robert Waddy's.

Dr. Norris went to see Fielding Grimes in response to this request, but received his compensation from Robert Waddy. Dr. Norris, who was introduced as a witness by Priscilla Grimes, testifies with reference to the condition of Fielding Grimes at this time as follows:

"I found Fielding Grimes at the home of Robert Waddy near Lancaster Court House and he was very comfortable, very well clad and in a good comfortable room. Robert Waddy and his wife told me that he had been in a suffering condition and had not been himself since he was down there. He was not in a condition to make a business transaction when I saw him. Kidney trouble is not a direct cause of insanity, but it certainly can impair the mind. He had swelling under the eyes due to uremic poison, which will sometimes impair the mind. Proper diet and the use of purgatives will discharge the poison and the patient will then improve. He was apparently in the secondary stage. I did not take his pulse, but I found that his condition was largely due to weakness and I heard afterwards that he was able to get up and walk downstairs and out of the house some. I have no reason to suppose he might not have gotten better and been able to transact business."

After Fielding had been at the home of Robert Waddy about a month he was able to get out of bed and stay up the better part of the day and to walk around the house and yard; and by Christmas, 1925, he was getting up nearly every day and on good days spending some time out in the yard.

On November 20, 1925, Robert Waddy was appointed committee for Fielding Grimes by the Circuit Court

of Lancaster county and qualified as such. This order of the court, which was never revoked, reads as follows:

"On the motion of Robert Waddy, nephew of Fielding M. Grimes, it appearing to the court from evidence produced, that said Fielding M. Grimes is *non compos mentis* and incapable of managing his own affairs, and it further appearing that notice in writing of this motion has been fully served on said Fielding M. Grimes, he, the said Robert Waddy is appointed committee of the estate of the said Fielding M. Grimes."

Robert Waddy's testimony with reference to his appointment as committee, which is not contradicted, is as follows:

"In November, while Lancaster court was in session, I saw Mr. B. C. Brent at the court house and told him that Uncle Fielding had asked me to take up for him and sell some oysters that he had on his oyster ground and Mr. Brent said that some one should qualify as committee to look after Uncle Fielding's affairs. I understood that Mr. Brent saw Mr. Sanders, the Commonwealths Attorney, and that I was appointed committee and I was told that I would have to give bond, which I did. The court heard no evidence with reference to it and I thought I was appointed to look after Uncle Fielding's affairs, as he was sick and could not attend to them himself."

Soon after Priscilla Grimes had been down to see her father she wrote Robert Waddy that as he had qualified as committee she wanted him to sell the land and send her father to the hospital; but as testified to by Annie Waddy, Fielding said that they were not going to put him off in any hospital.

According to the testimony of Robert and Annie Waddy, about the middle of December, 1925, Fielding

told Robert and Annie Waddy that he was going to give Annie Waddy his place and wanted them to take care of him as long as he lived and to pay two small debts he owed, one to Mr. R. O. Norris for $30.00 and the other to Mrs. Nellie P. Blakemore for $14.00, and asked Robert to get someone to come down there and fix up the deed "or him.

Later on he asked Robert's son to tell Mr. J. C. McKenny, a justice of the peace, residing in the neighborhood, to come up there as he wanted him to write a deed giving his place to Annie Waddy. Mr. McKenny in his testimony says that he got several messages from Fielding Grimes through Robert's son asking him to come up there, but that he did not go because he was busy.

During the Christmas holidays Mr. J. C. Davenport, according to his testimony, went to Robert's home to see Fielding Grimes and tried to buy the land here in question from Fielding. Mr. Davenport testifies with reference to this visit as follows:

"I found him out of doors in the yard, sitting on the platform of the well and asked him how he was, and he told me he had been paralyzed but was much better. I asked him if he wanted to sell his land and oyster shore and he told me that he would not sell it, as he was going to give it to Annie Waddy, as she and Robert Waddy, her husband, had been so kind to him since he had been sick; that his children had paid no attention whatever to him; that Robert Waddy and his wife were going to take care of him as long as he lived and that Robert Waddy was going to pay two bills that he owed, one to Mr. Norris and one to Mrs. Blakemore. He asked me to draw a deed for him to sign, making his property over to Annie Waddy, but I told him it would have to be acknowledged before an

officer and that he had better get Mr. J. C. McKenny, justice of the peace, to do it, as I was not an officer. He was perfectly normal when I saw him on that occasion and I would not have hesitated on that day to have taken a deed from him, to have transacted any business with him."

In the latter part of January, 1926, Dr. Oldham went to see Fielding again. With reference to his condition at that time he testifies as follows:

"After that (*i. e.*, October, 1925), I only saw him about twice before he had another stroke of paralysis in the latter part of March, from which time I attended him until his death on the 7th of April. The medicine seemed to remove the poison to a very considerable extent and then his mind would clear up and he would be much better. I remember that I went to see him some time in the latter part of January, 1926, and found him that day in very good condition, considering his ailments. I consider that on that day he was able to transact business and I would not have hesitated to have taken a deed from him. Judging from his condition as I saw it, I would say that he was growing worse but that he would frequently have lucid intervals, sometimes as much as two or three days." . . . . . "When I saw him in January, 1926, he said he wanted Annie Waddy to have everything he owned for taking care of him. I think he was just as well qualified at that time as he ever was in his life, but from reports brought to me by those coming for medicine, he must have gotten worse after I saw him. I did not see him again until after the third stroke," *i. e.*, March 25, 1926.

Early in March, 1926, Robert Waddy stopped by Mr. McKenny's home and asked him to go up to his house as Fielding Grimes wanted him to write a deed for him. On March 6, Mr. McKenny went to Robert's

house to see Fielding as requested. Robert was at Lancaster Court House, where Mr. McKenny later found him and brought him back with him, but Annie Waddy was at home and took Mr. McKenny to Fielding's room. Mr. McKenny testifies with reference to the drafting and execution of the deed from Fielding Grimes to Annie Waddy as follows:

"I found Grimes lying on the couch but dressed and I told him that I had received a message to come to see him, as I was informed he wanted to see me on some business. Grimes told me in Annie Waddy's presence that he had sent for me to come to see him as he wanted me to draw a deed conveying his land to Annie Waddy. He told me that he had nearly died from lack of attention and lack of food and that Robert Waddy had taken him from the jail and brought him down to his house and he and his wife had been taking care of him and were going to take care of him as long as he lived; that Robert Waddy was going to pay two small bills that he owed, one to Mr. R. O. Norris, Jr., amounting to $30.00 and some interest, and one to Mrs. Blakemore amounting to $14.00 and some interest; that his children had paid no attention to him and he wanted to deed to Annie Waddy his place.

"He told me that he bought the land from Mr. William Chilton many years ago and stated to me the boundaries. I told him that I was going on up to the court house and would stop in there and draw the deed on my way back, as Waddy's house was on the road from the court house to my home. I went on up to the court house and went in the clerk's office and looked up the deed and found that he had bought the land from Mr. William Chilton and that the boundaries were as he had stated them to be."

"I went on back to Waddy's house, taking Robert

Waddy with me, and taking the regular blank form for a deed. We went in the house and Robert Waddy and I went on upstairs to Fielding Grimes' room and I told Grimes that I had seen the deed from Mr. Chilton to him and that the boundaries were as he had stated them to be. I then sat down at a table and wrote the deed, using the same boundaries that were given in the deed from Mr. Chilton. After I wrote it, I read it to Grimes and asked him if that suited him and he said: 'That is exactly what I want.' I then asked him to sign the deed and he said he could not write, so I signed his name to it and told him he would have to take hold of the pen and make his mark, which he did. I then wrote out the acknowledgment and signed it and handed the deed to Grimes, but he told me to give it to Annie Waddy, which I did.

"The fact that $50.00 is stated as the consideration in the deed was my own suggestion. Grimes had told me that Robert Waddy was to pay two bills he owed, one of $30.00 to Mr. Norris, with some interest, and one of $14.00 with some interest, to Mrs. Blakemore, and I said to him that those two bills with interest would amount to about $50.00 and I would put that in the deed as a consideration, but Grimes stated to me that Robert Waddy and his wife, Annie, were to take care of him as long as he lived.

"On that day Grimes seemed to know thoroughly what he was doing. In fact, he told me what he wanted, as I myself did not know the purpose of my visit until he told me, and I would not have hesitated myself on that day to have transacted business with him, or to have taken a deed from him. After I had written the deed, I left and never saw Grimes again. In fact, that was the only time I ever knowingly went to Waddy's house while Grimes was staying there, I

had received several messages from Fielding Grimes by Robert Waddy's boys before Robert himself asked me to come, but I did not go down there because I was busy."

The deed from Fielding Grimes to Annie Waddy is dated March 6, 1926, and was recorded March 8, 1926. It conveys with general warranty of title and the usual modern covenants the fourteen and three-quarter acre tract owned by Fielding Grimes "in consideration of the sum of $50.00 cash in hand paid," and it contains no reference to any agreement of Annie or Robert Waddy to care for and support Fielding or to pay any debts.

On the same day said deed was executed, Mrs. Nellie P. Blakemore, who had known Fielding all her life, went to see him at Robert's house. Her testimony with reference to this visit and his mental capacity is as follows:

"Fielding Grimes was always peculiar but I always found that he knew whatever he was doing; that he knew the meaning of an obligation and always paid his debts and met his obligations, in fact, I considered him shrewd in business transactions. I do not know of his condition when he was sent to jail in October, 1925; and did not hear about it until some time thereafter.

"I had intended going to see him but later heard that he was much better and postponed my visit, but I did go to see him in the early part of March and carried him some things to eat. Annie Waddy took me up to his room and I gave him the things I brought him and sat down and talked with him. I found his mind perfectly clear and I would not have hesitated to have taken a deed from him on that day.

"He told me that Robert Waddy was going to pay me the $14.00 he owed and also going to pay a bill he

owed Mr. Norris, amounting to $30.00; that he had given his place to Robert and Annie Waddy because they had been so good to him during his illness and that they were going to take care of him as long as he lived; that they had been very kind to him and that his children had paid no attention to him at all. I considered his mind perfectly clear at that time and I do know that his children had paid absolutely no attention to him."

On or about March 25, 1926, Fielding Grimes had another stroke of paralysis, and Dr. Oldham was called to see him again, and attended him until he died on April 7, 1926. Dr. Oldham's testimony with reference to his physical and mental condition at this time is as follows:

"Some time about the 25th of March I was called to see him again and found that he had had another stroke and from that time he steadily grew worse until he died early in April. . . . At no time did I see Fielding Grimes when I considered him insane. . . . In the spring of 1925, Grimes had a slight stroke of paralysis; in the fall, at the time he was carried to jail, he had a second stroke, and had the third stroke about two weeks before he died. He was in a stupor from that stroke (the third) until his death."

The foregoing testimony of Dr. Oldham is quoted from his testimony before the jury. Prior to the order for an issue out of chancery his deposition had been taken by the complainant. His deposition is in part as follows:

"Q. Did you have occasion to visit him subsequent to the time he was put in jail and if so where and how many times?

"A. I did, several times at the home of Robert Waddy.

"Q. Please state whether or not his condition, mentally and physically, improved or became more impaired.

"A. At first he improved slightly; afterwards, he became worse, due to uremic posion.

"Q. Did uremic poisoning affect his mind?

"A. It did.

"Q. At your visits to him in the year 1926, from your impression professionally of his condition, did you think he possessed the capacity to know the nature and effect of a deed for land?

"A. On some visits, when his system was charged with uremic poison, he did not; but at one visit when the poison had been partially eliminated, his mind seemed clearer and he may have been capable of transacting business at that time; because at that time he told me that he wanted Annie, Robert Waddy's wife, to have his place because she had been so kind to him; that was some time after Christmas.

"Q. At the time you first saw Grimes, did not you consider his case a hopeless one, physically and mentally?

"A. Physically I did, but could not give prognosis of his mental condition at that time.

"Q. Please state the symptoms caused by the disease with which he was suffering during the time you visited him and prescribed for him.

"A. Incoherent ideas, mental dullness, at times insomnia, nervousness, hallucinations, delusions, which finally end in most cases in stupor and profound coma, this refers to symptoms of uremic poison in general.

"Q. What symptoms named above did Grimes appear to have?

"A. Incoherent ideas, nervousness, at times insomnia and stupor."

The testimony of both Robert and Annie Waddy is that at the time Fielding Grimes executed the deed to Annie Waddy he knew everything he was doing.

None of the witnesses introduced by the complainant to support her allegation that Fielding Grimes was not mentally capable of making a valid deed on March 6, 1926, saw Fielding Grimes between November, 1925, and April, 1926; and no fact testified to by them occurred during that period. A *resume'* of all the testimony of complainant's witnesses which bears upon the mental capacity of Fielding Grimes is as follows:

Mr. J. C. Brent, who did not see Fielding Grimes after the day he was taken to jail, testifies that on that day he was in a stupor and was mentally incapable of attending to any business. He expressly states that he cannot say what his mental condition was at any time after October 25, 1925.

Dr. Norris who saw Fielding Grimes only once, which was in November, 1925, testified before the jury as quoted above. His deposition had also been taken prior to the order for an issue out of chancery, in which he testified as follows:

"Q. Did you know Fielding Grimes?

"A. I saw him once in November, 1925, at the home of Robert Waddy.

"Q. Please state what condition he was in mentally at that time (*i. e.*, November, 1925).

"A. I did not give him a mental examination but I considered his condition such that I would not have considered a business proposition with him.

"Q. Was he in any condition, mentally, to know the nature and effect of a deed for land?

"A. Just in one attendance I do not feel that I would be justified to give the diagnosis of his mental condition, but I would not have considered taking a deed from him.

"Q. Why not,

"A. In the first place, I would be prejudiced from reports, and in the second place, I would like to see one who is ill more than once before considering a business proposition.

"Q. You say you were called to see him. What condition did you find him in, and what treatment did you give him?

"A. As well as I can remember Grimes was in bed, suffering from cold and general weakness, supposed to be due from his confinement in prison. Examination showed heart weakness and kidney complications. I gave the usual treatment for the same.

"Q. Was he in a stupor?

"A. Apparently he was in a semi-stupor, as well as I remember.

"Q. Did the diseased condition you speak of have a tendency to weaken his mind?

"A. Most any disease if continuous will affect the mind.

"Q. Did you ever see him any more?

"A. No.

"Q. Did you ask Grimes the usual questions as to his symptoms in your effort to diagnose his trouble?

"A. Yes, sir.

"Q. Did he answer you intelligently as to same?

"A. As I remember the answers were only fair.

"Q. Do I understand by this that you could not obtain from him sufficient information to know the cause from which he was suffering, and did not you have to rely upon your skill as a physician to ascertain his trouble?

"A. A combination of the two.

"Q. Is it not a fact that at the time you saw Grimes he was in a badly run down physical condition?

"A. Very, I don't know whether he improved any or not."

Mr. J. H. Folly, who did not see Fielding Grimes after about a week before he was taken to the jail in October, 1925, testifies that he had known him for twenty-five or thirty years; that when he saw him about a week before he was taken to jail he "considered him a little off in his mind;" and that "he was always rather peculiar and different from other people."

Mr. L. D. Stoneham, who testifies that the last time he saw Fielding Grimes was in the spring of 1925, when he (Fielding) came to see him to sell him a note he had taken for a house he had sold, says: "While Fielding Grimes was peculiar, he was always able to take care of himself in every way from a business standpoint. He would pay his debts promptly and always seemed to know how much he owed or was due him. When he came to see me in the spring of 1925, to sell me the note about which I have testified, I told him I would buy the note if he would allow me a discount of six per cent, but he said he could not do that, as the note would bear interest and he was willing to pay me that for taking it." This impresses us as being rather an indication of mental strength than of mental weakness.

Mr. Miller, who for thirteen years had lived only a few hundred yards from the home of Fielding Grimes, last saw him the day he was taken to jail, says: "In the fall of 1925, Mr. F. P. McGinnes suggested that we go down to see about him. We went to his place and found him lying down on the ground in front of his house. He was cold and could not sit up and just mumbled some. Not long before that he had told Mr. F. P. McGinnes that he had religion and when he died he was going to Heaven. He had been sending

out west for some patent medicine and seemed to be getting worse physically, and I do not believe his mind was right. He said he had seen Christh and He would save his soul."

█ It may be that expressions of religious faith and feeling are somewhat less common than they once were; but the statement by a man that he "has religion and is going to Heaven," and that "he has seen Christ and He would save his soul," have hardly yet become proof of insanity or mental weakness.

Mr. Purnell Sanders, who testifies that he saw Fielding Grimes in the summer of 1925, and next in April, 1926, describes his condition when he saw him in April, 1926, about which there is no controversy, and then says! "I had previously seen him in the summer of 1925, and he said: 'They are trying to get my property from me.' He was carrying his deed with him to keep the white people and negroes from getting his land from him. He claimed his spring was poisoned."

Mr. B. F. McCarty, who does not testify to having seen Fielding Grimes at any time after October, 1925, testifies: "My son cultivated his land in 1925, for one third the corn. I objected to his doing this because I knew that Fielding was always very peculiar and I told my son that I thought he would have trouble with him, as I knew he was hard to deal with * * * * * My son tried to buy this land from Grimes in 1925, and after Fielding had conveyed it to Annie Waddy, he tried to buy it from Waddy and wife."

It is not without significance that Mr. Davenport (see *ante*) and Mr. McCarty's son, both of whom lived in the neighborhood and knew Fielding Grimes well, should have been willing to purchase this property from Annie Waddy.

Mr. Latane Currie, who last saw Fielding in the summer of 1925, referring to the summer of 1925, says: "I saw Fielding Grimes at McGinnes' well and he was muttering. Later he came to my house and said his grandfather used to own 'all this land.' His people belonged to my people before the civil war. I don't know what kind of medicine he had been taking. I don't consider that he was capable of making a deed at that time."

Mr. Ernest Dobbins, deputy commissioner of the revenue, testifies that in 1925: "I saw Fielding Grimes and told him that I wanted to assess his property for taxation. He said: 'The angels told me not to pay any more taxes.' I would not consider him at that time a sane man * * * * I had been told his mind was impaired and decided then that he was out of his mind."

To one familiar with the mental processes and idioms of the Southern negro of Fielding's environment and generation, this statement to the tax assessor seeking to list him for future taxation made by a negro some sixty years of age, who is suffering from a serious chronic disease of which he is cognizant, is not a surprising statement, and certainly not an indication that the old negro is insane. It was probably his way of saying: 'I am not going to live long and there is no use in my keeping on paying taxes on what little I have.'

As committee of Fielding Grimes, Robert Waddy received for oysters taken up and sold by the committee and from the sale of the corn received as rent of said fourteen and three-fourths acres, $83.40; and prior to March 6, 1926, expended for clothing, bedding, medicines, and doctors' bills for Fielding $91.05. After the death of Fielding, Robert Waddy paid said

debts due Mr. Norris ($31.40) and Mrs. Blakemore ($14.00); the 1925 taxes, $28.75, due by Fielding Grimes; for his coffin $70.00, his other burial expenses and a few other items. Neither Robert nor Annie Waddy have received any remuneration, other than the conveyance of said land, for their care and maintenance of Fielding Grimes, or for any of the said sums paid after the death of Fielding. There is an insinuation that Robert may have taken up and sold more oysters than he has reported, but there is no proof of the insinuation.

The fact that this negro man has not made a report of his acts as committee to the commissioner of accounts has no significance in relation to the questions here before the court.

On July 26, 1926, Annie Waddy and Robert Waddy sold and conveyed said fourteen and three-fourths acre tract to St. Paul Carter for $1,200.00; which appears to have been the approximate fair value thereof.

We are unable to concur with the finding of the learned judge of the trial court "that Fielding Grimes on the 6th day of March, 1926, at the time he executed the deed to Annie Waddy, was mentally incompetent to execute said deed."

So far as the evidence shows, Fielding Grimes had no organic disease of the brain, and was not afflicted with any form of permanent insanity or general, primary derangement of the mind. This case at bar is materially different from the case of *Fishburne* v. *Ferguson*, 84 Va. 87, 4 S. E. 575, relied upon by the appellee, in which the mental incapacity of the grantor was due to insanity in its common sense of a general, primary derangement of the mind.

The mental incapacity of Fielding Grimes, which

evidence shows to have been present at times prior to March 6, 1926, was temporary and intermittent. It was due to toxaemia resulting from physical disease, nephritis, from which he had suffered for some undisclosed length of time. His trouble was primarily physical, and his mental condition depended largely upon his physical condition, which in turn depended much upon the care and attention he was receiving and the medical treatment being given him. As a result of this physical disease, toxines were secreted in the body, which, when present in excessive quantities, had a virulent action on the brain and very seriously affected the functioning of the mind, producing mental incapacity, and at times coma, until the excess accumulation of toxines is eliminated, when the mind clears up.

■■ Under the facts of this case proof that as a result of toxaemia, resulting from physical disease aggravated by exposure, lack of attention and nourishment and medical treatment, Fielding Grimes was rendered mentally incompetent to attend to business during October and November, 1925, and because of such condition was adjudged *non compos mentis* in November, 1925, and a committee appointed for him raises no presumption of law that he was *non compos mentis* on March 6, 1926. The mental capacity of Fielding Grimes to make a deed or dispose of his property by will on March 6, 1926, is a question of fact to be determined from the evidence, but with the burden resting upon the proponents of the deed or will to prove his mental capacity at the time of the execution thereof.

■ The proponents of the deed from Fielding Grimes to Annie Waddy have fully carried this burden. The evidence, we think, clearly shows that at the time he

executed said deed Fielding Grimes was mentally competent to make said deed, knew and comprehended what he was doing, and did what he intended to do and had for some time intended to do.

Nor is there proof in this case that Robert or Annie Waddy procured this deed by fraud or the exercise of undue influence.

"Fraud and undue influence are never presumed. The burden of showing undue influence rests upon those who allege it, and it cannot be based upon bare suggestion, innuendo or suspicion," *Core* v. *Core*, 139 Va. 1, at page 14, 124 S. E. 453, 457; it must be affirmatively proven by clear, cogent and convincing testimony proving the acts which constitute the exercise of undue influence or circumstances inconsistent with fair dealing from which the exercise of undue influence may be fairly and reasonably inferred. Schouler on Wills (5 ed.), section 239; *Dearing* v. *Dearing*, 132 Va. 178, 111 S. E. 286; *Thornton* v. *Thornton*, 141 Va. 232, 126 S. E. 69.

We are here speaking of actual fraud and undue influence, and not of constructive fraud or undue influence which in certain confidential relationship the law is said to presume, sometimes conclusively, in disregard of the actual facts in the particular case with respect to whether or not constructive fraud or undue influence must .as a matter of law be presumed to exist in this case we shall deal later.

The only acts of Robert and Annie Waddy shown by this record which might have influenced Fielding Grimes to have made this deed are their promise to care for and support him as long as he lived, and their kindness and care of him. Kindness and attention to, and care of a person even under the circumstances here disclosed, do not constitute the

exercise of undue influence. *Paramore* v. *Taylor*, 11 Gratt. (52 Va.) 220; *Thornton* v. *Thornton*, 141 Va. 241, 126 S. E. 69.

Nor can we agree with the trial court that the consideration for this conveyance was so grossly inadequate as to shock the conscience or to warrant an inference that undue influence must have been exercised in order to procure the execution of the deed. The evidence clearly shows that the consideration for the deed was not the nominal consideration of $50.00 mentioned in the deed; but the promise of Annie and Robert Waddy to take care of Fielding Grimes as long as he lived and to pay the two debts above mentioned; and in addition there is the very evident desire, intention, and purpose on the part of Fielding Grimes not only to remunerate Annie Waddy for the kindness, care and attention shown him by her and her husband, but to bestow a bounty upon her. This is not a mere case of bargaining between the grantor and the grantee. Even viewed in retrospect we think it cannot reasonably be said that a man so situated as was Fielding Grimes would not, if in the full possession of his mental faculties, have made this deed, or ought not to have made it.

It is true that the deed contains no covenant on the part of Annie and/or Robert Waddy to take care of Fielding Grimes or to pay his debts; but it is clearly proved that this was a consideration for the deed, and that the omission thereof from the deed was due to no fault of Annie or Robert Waddy, but was due to the error of the draftsman called in by Fielding Grimes to draft the deed and to his lack of appreciation of the patent propriety of stating said consideration in the deed. We are here dealing with simple folk without legal training in such matters, and the ac-

ceptance by Annie Waddy of this deed without a covenant therein on the part of herself and her husband to care for and maintain Fielding Grimes and to pay his said debts, is not, under the circumstances of this case, to be taken as a badge of fraud.

We have heretofore found that on March 6, 1926, at the time the deed to Annie Waddy was executed, Fielding Grimes was mentally competent to make a contract or to dispose of his property by deed or will, knew what he was doing, and in making said deed did what he had for some time desired and intended to do; and that there is no proof of actual fraud having been perpetrated upon him or undue influence exercised upon him.

This being true, according to the great weight of authority, had no committee been appointed for Fielding Grimes, even though he had been adjudicated *non compos mentis* in November, 1925, not only would a will made by Fielding Grimes on March 6, 1926, devising this property to Annie Waddy have been a good devise, but this deed would constitute a valid conveyance. *Reed* v. *Reed*, 108 Va. 790, 62 S. E. 792; *Weeks* v. *Reliance Fertilizer Co.*, 20 Ga. App. 498, 93 S. E. 152; *Fay* v. *Burditt*, 81 Ind. 433, 42 Am. Rep. 142; *Mileham* v. *Montague*, 148 Iowa 476, 125 N. W. 664; *Topeka Water-Supply Co.* v. *Root*, 56 Kan. 187, 42 Pac. 715; *Lower* v. *Schumacher*, 61 Kan. 625, 60 Pac. 538; *Johnson* v. *Mitchell*, 146 Ky. 382, 142 S. W. 675; *Chase* v. *Spencer*, 150 Mich. 99, 113 N. W. 578; *Rider* v. *Miller*, 86 N. Y. 507; *Missouri P. R. Co.* v. *Brazzil*, 72 Tex. 233, 10 S. W. 403; *Manly* v. *Staples*, 65 Vt. 370, 26 Atl. 630; *Small* v. *Champeny*, 102 Wis. 61, 78 N. W. 407.

Also the great weight of authority is that, even though Fielding Grimes was in November, 1925,

adjudicated *non compos mentis* and a committee then appointed for him, if he was mentally competent on March 6, 1926, to make a will, a will made by him on that date would be valid. *In re Weedman's Estate*, 254 Ill. 504, 98 N. E. 956; *Holliday* v. *Shepherd*, 269 Ill. 429, 109 N. E. 976, 7 L. R A. 558 and note; *Harrison* v. *Bishop*, 131 Ind. 161, 30 N. E. 1069, 31 Am. St. Rep. 422; *In re Fenton's Will*, 97 Iowa 192, 66 N. W. 99; *Linkmeyer* v. *Brandt*, 107 Iowa 750, 77 N. W. 493; *In re Hanrahan's Estate*, 182 Iowa, 1242, 166 N. W. 529; *Stone* v. *Damon*, 12 Mass. 488; *Boston Safety Dep. & T. Co.* v. *Bacon*, 229 Mass. 585, 118 N. E. 906; *In re Chandler*, 102 Me. 72, 66 Atl. 215; *King* v. *Gilson*, 191 Mo. 307, 90 S. W. 367; *Jordon* v. *Dickson*, 19 Ohio L. J. 64; *Hoopes' Estate*, 174 Pa. 373, 34 Atl. 603; *Collins* v. *Long*, 95 Or. 63, 186 Pac. 1038, 8 A. L. R. 1370; *Williams* v. *Robinson*, 39 Vt. 267; *In re Cowdry's Will*, 77 Vt. 359, 60 Atl. 141, 31 Ann. Cas. 70.

But it is contended that even if the deed to Annie Waddy was executed when Fielding Grimes was in fact mentally competent to make a contract or dispose of his property by deed or will, and though there was in fact no actual fraud and no undue influence exercised upon Fielding Grimes, yet the deed is void, or at least voidable for one or both of the following reasons:

(1) Because the deed was executed after Fielding Grimes had been adjudicated *non compos mentis* and while he was under the guardianship of a committee appointed for him by the court;

(2) Because Robert Waddy was the duly appointed committee of Fielding Grimes, and was the real beneficiary of the deed to his wife, Annie Waddy.

There are a number of authorities which hold that deeds and contracts made by a person after he has been adjudicated insane or mentally incom-

petent *and a committee has been appointed for him*, and while the guardianship continues are absolutely void even though the ward was in fact sane and mentally competent at the time of the execution thereof.

The rationale of these decisions is succintly stated in *Thorpe* v. *Hanscom*, 64 Minn. 201, 66 N. W. 1, 2, as follows:

"This rule is based upon convenience and necessity, for the protection of the guardian, and to enable him properly to discharge his duties as such. Without this rule it would be difficult, if not impossible, for the guardian to execute his trust, for in every action concerning the property of the ward he might be obliged to go before the jury upon the question of the ward's sanity, and one jury might find one way and another the other way."

When the reason for the rule does not exist, the rule does not apply. Hence, if there is in fact no actual and subsisting guardianship, but the same has been practically abandoned, the rule does not apply (*Elston* v. *Jasper*, 45 Tex. 409; *Thorpe* v. *Hanscom*, 64 Minn. 201, 66 N. W. 1; *Chase* v. *Spencer*, 150 Mich. 99, 113 N. W. 578); or if the guardian or committee has died, been discharged, or removed and no other guardian or committee appointed, the rule does not apply. *Miller* v. *Rutledge*, 82 Va. 863, 1 S. E. 202; *Reeves* v. *Hunter*, 185 Iowa, 958, 171 N. W. 567, at page 571; *Willwerth* v. *Leonard*, 156 Mass. 277, 31 N. E. 299.

Likewise, the reason for the rule does not exist when the ward is in fact mentally competent to contract and make a conveyance of his real estate and his committee is present and consenting thereto. In the case at bar the committee was present and consenting to the execution of the deed to Annie Waddy, and it is also to be noted that this contract and conveyance was

not one which the committee could himself have made, any more than he could have made a will for Fielding Grimes.

Were this a deed executed by Fielding Grimes with the consent of his committee to some person unconnected with Robert Waddy, the committee, we think there could be no question as to the validity of the deed; but the deed having been executed to the wife of the committee brings us to the charge that the deed is void, or at least voidable, because the deed is made to Annie Waddy, the wife of Robert Waddy, the committee of Fielding Grimes.

The question now before us is not a question of sanity or mental competency, or of the actual exercise of undue influence, but of the effect of the existence ·of a fiduciary relationship existing by reason of the fact that Robert was the duly appointed and presently acting committee of Fielding Grimes at the time the deed to his wife, Annie Waddy, was executed.

Even had this deed been made to Robert Waddy himself equity would raise no conclusive presumption of its invalidity. Equity would raise a *prima facie* presumption against its validity, and would cast upon the party seeking to sustain the deed the burden of proving affirmatively its compliance with equitable requisites and overcoming the presumption.

There is a distinction to be made between transactions occurring directly between a trustee and his *cestui que trust*, and those transactions in which the trustee deals with himself in respect to the trust estate. The latter class of transactions are voidable by the *cestui que trust* at his election without giving any reason or alleging any fraud, or any advantage or inadequacy of price. But where the trustee deals directly with the *cestui que trust*, the transaction is not *ipso*

*facto* voidable at the election of the *cestui que trust;* but only *prima facie* presumed to be invalid, which presumption may be rebutted. *Colton* v. *Stanford,* 82 Cal. 351, 23 Pac. 16, 16 Amer. St. Rep. 137, at pages 146-147; Adams on Eq. (8th ed.), 59 and 183, *et seq.;* Kerr on Fraud and Mistake (Ed. 1872), 151; Pomeroy's Eq. Jurisp. (4th ed.), sections 957-958. See also *Banner* v. *Rosser,* 96 Va. 238, 31 S. E. 67; *Broadus* v. *Broadus,* 144 Va. 727, 130 S. E. 794.

As is said in Kerr on Fraud and Mistake, at page 151: "This rule does not, however, go the length of avoiding all transactions between parties standing in fiduciary relation and those to whom they stand in such relation. All that the court of equity requires is that the confidence which has been reposed be not betrayed. A transaction between them will be supported, if it can be shown to the satisfaction of the court that the parties were, notwithstanding the relation, substantially at arm's length and on an equal footing, and that nothing has happened which might not have happened had no such relation existed. The burden of proof lies, in all cases, upon the party who fills the position of active confidence to show that the transaction has been fair. If it can be shown to the satisfaction of the court that the other party had competent and disinterested or independent advice, or that he performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that his consent was not obtained by reason of the power of influence to which the relation gave rise, the transaction will be supported."

In Adams on Eq. (8th ed.), it is said: "There is no positive rule that he cannot deal with his *cestui que trust;* but in order to do so, he must fully divest himself of all advantage which his character as trustee

might confer, and must prove, if the transaction be afterwards impugned, that it was in all respects fair and honest." Adams on Equity (8th ed.), 183, see also page 59.

While the common law doctrine of the unity of husband and wife has been largely destroyed by the Virginia statutes in so far as it concerns the property rights of the wife and her power and freedom to contract, yet the community of interest which exists between them, generally speaking, will invalidate a contract made with or deed to the wife of a trustee, in which transaction the husband participates, when it would be voidable if made with or to the trustee, and in all such cases will subject the transaction to the searching scrutiny of a court of equity. *Bassett* v. *Shoemaker*, 46 N. J. Eq. 538, 20 Atl. 52, 19 Amer. St. Rep. 435. But the equities of the wife where clearly established by clear and convincing evidence may not be disregarded merely because she is the wife.

The evidence here fails to show or warrant the inference that this deed was made to Annie Waddy as a cloak for conferring a benefit on Robert Waddy. It is true that a consideration for said deed is the joint promise of Robert Waddy and Annie Waddy to care for and support Fielding Grimes and of Robert Waddy to pay said two small debts; that, as her husband, he is incidentally benefited thereby; and that she may permit him, as many wives have done, to take and use the whole of the proceeds of the sale thereof and thereby become in a sense the real beneficiary thereunder. But Annie Waddy, by her joint promise to support and care for Fielding Grimes, contracted to render to him her services, or a substitute therefor, in nursing and caring for Fielding Grimes and placed her financial responsibility, including what she re-

ceived under this conveyance, behind her obligation to care for and support him; and it was evidently her services, care and nursing which Fielding felt had ministered to his care, comfort and well being since he had been brought to their home, and upon which he relied for his future care and comfort.

These equities of the heirs of Fielding Grimes, his children, one of whom has not been heard of in many years and the other of whom has shown little filial regard for him while he was living, are weaker than would be those of Fielding Grimes were he alive and seeking to avoid this deed. *Bowles* v. *Bowles*, 141 Va. 35, 126 S. E. 49; and it is to be noted that the heir has waited for more than a year after said deed was executed and recorded and more than nine months after the property had been sold and conveyed by Annie and Robert Waddy to a party claiming to be an innocent purchaser for value, before attacking this deed. This case smacks of no actual fraud or exercise of undue influence. If bounty there was in the consideration given by Fielding Grimes for the promise of Annie Waddy and her husband to support and care for him and pay his few debts, it has been extended to those to whom it is not unnatural that it should be extended; and Annie Waddy and her husband have faithfully executed their contract on their part.

In order that we may not be misunderstood we again reiterate the rule that where a deed is made by a *cestui que trust* to the wife of his trustee conveying a part of the trust estate, the presumptions are against the validity of the deed, and the burden is cast upon the grantee by her relationship to the trustee to prove by clear and convincing evidence that the transaction has been fair and equitable, and that the confidence

which has been reposed in her husband by the grantor has not been taken advantage of, abused or betrayed.

However, upon the whole record we are of the opinion that in this case the equities are clearly with Annie Waddy, and that the court erred in setting aside the said deed from Fielding Grimes to Annie Waddy, the deed from Annie Waddy and husband to St. Paul Carter, and the deed of trust from St. Paul Carter and wife to Matthew Waddy, trustee. Therefore, the decree of the trial court will be reversed and the bill dismissed.

*Reversed.*