## CIRCUIT COURT OF FAIRFAX COUNTY

Cascades West Assocs.
Limited Partnership

    v.

PRC, Inc.

May 11, 1995

Case No. (Law) 128818

BY JUDGE STANLEY P. KLEIN

In its two count Amended Motion for Judgment, plaintiff Cascades West Associates Limited Partnership (CWA) seeks judgment against PRC, Inc., for sums claimed due for the months of July through December 1994 as a result of section 31 of a certain lease agreement dated August 27, 1982 (the Cascades West lease) between CWA and Advanced Technology, Inc. (ATI), a corporate predecessor to PRC. The parties also make cross-claims for attorneys' and expert witness' fees. CWA also seeks to recover certain expenses relating to efforts to re-lease the subject property. CWA also asks this Court for a declaratory judgment that the Cascades West lease, including section 31, remains valid and in full force and effect. PRC asserts *inter alia* that the Cascades West lease has been properly voided, that section 31 is an impermissible penalty provision and that even if section 31 had been enforceable at one time, PRC had been relieved of any further liability under that section prior to July 1, 1994. For the reasons hereinafter set forth, the Court rejects each of PRC's defenses and finds for CWA.

## I. *Basic Factual History*

In the 1970's ATI was principally in the business of providing professional systems integration through government contracts. As its business grew in the late 1970's, ATI began looking towards relocating its offices and forming a corporate headquarters complex. In March of 1980 Robert E. LaRose, as the President, CEO and Chairman of the Board of ATI, and others, negotiated with Christopher Walker, on behalf of Dupree District Associates (Dupree), to lease facilities in what was to be known as the Cascades Executive Center. This project, to be located in Reston, would eventually consist of four large office buildings known as Cascades North, Cascades West, Cascades East, and Cascades South.

By letter of intent dated March 11, 1980, ATI agreed to become the sole tenant in Phase I of the project, or the Cascades North building. Another letter of intent signed on that date indicated that Regency Investments, a partnership formed by key officers and directors of ATI,[1] was to become a co-owner of the Cascades North building, "predicated on acceptance of the lease terms by Advanced Technology, Inc., as elaborated in the attached letter." These letters also gave ATI the right to lease Phase II (the Cascades West Building) and Regency the option to participate in Phase II of the project, "provided that Advanced Technology, Inc., leases and occupies these premises." The lease for the Cascades North Building was signed on December 2, 1980, and Regency[2] was given a 66 2/3% limited partnership interest in Cascades North Associates Limited Partnership (CNA),[3] which held a 50% joint venture interest in the Cascades North Venture Limited Partnership (CNV), the entity created to own the Cascades North building.[4]

As its employee base continued to grow, ATI realized the need to further expand its facilities. On August 27, 1982, plaintiff CWA and ATI entered

---

[1] The Regency Limited Partnership was comprised of LaRose, Ronald Hobbs, Bronson F. Byrd, and Girish Jindia.

[2] Regency Investments II Limited Partnership (Regency II), formed on November 4, 1980, later replaced Regency as limited partner of CNA. The partners of Regency II also included LaRose, Byrd, Hobbs, and Jindia.

[3] The remaining interest in CNA was owned by TCF No. 3 Associates, which was a limited partnership comprised of Walker, general partner, and Frederick Dupree and Thomas Dupree, limited partners.

[4] The other 50% interest in CNV was owned by Mass Mutual Mortgage and Realty Investors (Mass Mutual) which financed the North building project.

into a lease for the Cascades West building. Pursuant to this agreement, Regency Investments III Limited Partnership (Regency III)[5] was given a 50% limited partnership interest in CWA.[6] The initial lease term was to commence on December 15, 1983, and expire on March 15, 1989, with an option to renew for two additional terms of five years each. Section 31 of the Cascades West lease, the key provision in this case, provided in part:

> Tenant agrees that it shall continue to be obligated for rent due on any space vacant at the end of the Lease Term or Renewal Term unless satisfactory substitute tenancy shall have been arranged and such satisfactory substitute tenant shall have commenced paying rent.

A "satisfactory substitute tenant" was defined as "a credit-worthy tenant paying rent not less than the Basic Rent under Sections 4 and 5 hereof, calculated to the date of occupancy of the satisfactory substitute tenant." This section also provided that "in the event landlord accepts a substitute tenant for all or part of the Leased Premises, the obligation of Tenant to continue to pay rent for such space shall forever cease, except to the extent that the rent received is less than the rent due under this Lease for the period in question."

At an annual meeting of the shareholders of ATI held on September 29, 1983, it was unanimously resolved "that the actions taken and business transacted by the Board of Directors in the management of the Company for the year June 1, 1982, to May 31, 1983, are hereby ratified, approved and confirmed."

On January 1, 1988, ATI entered into an Agreement and Plan of Merger with Emhart Corporation, the former parent corporation of Planning Research Corporation (PRC), and Emhart Consolidation, Inc., a wholly owned subsidiary of Emhart, whereby the shareholders of ATI, including its officers, had their shares in the company purchased for one hundred and forty million dollars. On February 12, 1988, after Emhart assumed control of ATI, ATI exercised the first five year renewal option, thereby extending the term of the Cascades West lease to March 15, 1994. In April 1990 The Black & Decker Corporation acquired Emhart and in December 1990, ATI

---

[5] Regency III was initially comprised of only LaRose and Byrd but before execution of the Cascades West lease, was increased to twenty-four key employees of ATI.

[6] The other 50% of CWA is owned by TCF No. 4 Associates. Walker is the general partner of TCF No. 4 Associates.

merged with Planning Research Corporation, forming PRC, which became the successor to the Cascades West lease.

On February 19, 1993, PRC informed CWA that it did not intend to honor the rent guarantee obligation of section 31. PRC subsequently informed CWA that it intended to holdover after March 15, 1994, as a monthly tenant, although it did not intend to exercise the second five year renewal option. In July 1994, PRC began to reduce its monthly rent payments by approximately $30,000. PRC still occupies the Cascades West building.

## II. Conflict of Interest Transaction

At the time that the Cascades West lease was executed, a number of the officers of ATI, including LaRose and Byrd, also had an interest in Regency III, the fifty percent limited partner of the landlord CWA. As a result, CWA concedes that the Cascades West lease transaction was a "conflict of interest transaction" as set out in former § 13.1-39.1 of the Virginia Code.[7] Pursuant to that section, "(a) no contract or other transaction shall be either void or voidable provided that the material facts as to his or their relationship are disclosed or known:"

> (i) to the board of directors . . . or
>
> (ii) to the stockholders entitled to vote and they authorize, approve or ratify such contract or transaction by vote or written consent;
>
> (b) In any event no contract or other transaction described in subsection (a) of this section shall be void or voidable despite failure to comply with parts (i) or (ii) of this subsection (a), provided that such contract or transaction was fair and reasonable to the corporation in view of all the facts known to any officer or director at the time such contract or transaction was entered into on behalf of the corporation. In any action for relief for the corporation on account of a contract or other transaction described in subsection (a) in which there was no compliance with parts (i) or (ii) of subsection (a) such contract or transaction may be voided for the benefit of the corporation and the court may grant other appropriate relief unless the party seeking to uphold the contract or transaction sustains the burden of proving

---

[7] This Code section was repealed and replaced by Va. Code § 13.1-691. The parties agree, however, that the provisions of former § 13.1-39.1 govern in this case.

that such contract or transaction complied with the requirements of the first sentence of this subsection (b).

The parties have extensively briefed and argued (1) whether there was shareholder ratification of the Cascades West lease transaction;[8] (2) the appropriate placement of the burden of proof on that issue; and (3) whether shareholder ratification obviates the necessity for a "fairness" analysis under subsection (b) of the statute. The Court need not decide these issues because the Court finds that the plaintiff has established compliance with § 13.1-39.1(b).

The Supreme Court of Virginia has not yet established a test for determining whether a conflict of interest transaction entered into by "interested" officers or shareholders is "fair and reasonable" to the corporation. This Court adopts the following test set out in the opinion of the United States Supreme Court in *Pepper v. Litton*, 308 U.S. 295 (1939):

> Their dealings with the corporation are subjected to scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599, 415 S. Ct. 209, 212, 65 L. Ed. 425. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.

*Id.* at 306-7.

Although the parties agreed at trial that the Court should adopt this test, they disagreed on the burden of proof that the plaintiff should bear. CWA contends that it bears the burden of proof by a preponderance of the evidence, while PRC counters that the evidence must be clear and convincing. Absent proof of authorization or ratification under sub-section (a), 13.1-39.1(b) clearly placed the burden of proof on the "interested" directors. The statute was silent, however, on the level of proof required. In determining the meaning of a statute, it will be presumed, in the absence of express words to the contrary, that the legislature did not intend to alter

---

[8] Plaintiff initially argued that the transaction was authorized by the shareholders at their special meeting on February 9, 1981, and then ratified at their meeting on September 29, 1993. It abandoned its authorization position in closing arguments.

the common law. *N. & W. R. Co. v. Virginian R. Co.*, 110 Va. 631 (1910). In conflict-of-interest transactions, when the party seeking to uphold the transaction was acting as a fiduciary at the time the transaction was entered into, that party bears the burden of proving that the transaction was fairly conducted. *Saunders v. Russell's, Inc.*, 173 Va. 125, 131 (1939) (When the plaintiff, as the secretary and treasurer of the defendant corporation, claimed that the corporation was indebted to her on several loans she had made, the Court held that the burden of proof was with the plaintiff "to show *clearly* that the loans were either authorized by the corporation or that they actually received them."). In *Adelman v. Conotti Corp.*, 215 Va. 782 (1975), the Supreme Court held that an officer of a corporation, when dealing with the corporation, has the same fiduciary duties as the trustee of a trust. In ruling that such transactions are presumed invalid unless the fiduciary sustains the burden of establishing the fairness of the transaction, the Court approvingly cited its holding in *Waddy v. Grimes*, 154 Va. 615 (1930). The *Waddy* Court left no doubt as to the quantum of proof necessary when it stated:

> In order that we may not be misunderstood we again reiterate the rule that where a deed is made by a cestui que trust to the wife of his trustee conveying a part of the trust estate, the presumptions are against the validity of the deed, and the burden is cast upon the grantee by her relationship to the trustee to prove by *clear and convincing evidence* that the transaction has been fair and equitable and that the confidence which has been reposed in her husband by the grantor has not been taken advantage of, abused or betrayed [emphasis supplied].

*Id.* at 650-51. CWA urges this Court to reject this holding in *Waddy* because of the Supreme Court's decision in *R. F. and P. Corp. v. Little*, 247 Va. 309 (1994), wherein the Court rejected a clear and convincing evidence standard for the imposition of civil penalties against a public official under Va. Code § 2.1-346.1. CWA's reliance on *Little* is misplaced. In its opinion, the Court did indeed reiterate the general rule that the standard of proof in civil cases is generally by a preponderance of the evidence. *Id.* at 318. However, it noted that the clear and convincing evidence standard will be applied in cases that are equitable in nature, including those involving undue influence. The logical underpinning behind § 13.1-39.1 was to check the influence that "interested" directors might have in transactions between themselves and their corporation. Accordingly, this Court

holds that CWA must establish the "fairness" of the Cascades West lease by clear and convincing evidence. *See also Lynch v. Patterson*, 701 P.2d 1126, 1132 (Wyo. 1985), wherein the Supreme Court of Wyoming held that the clear and convincing standard applied in the context of its version of Va. Code § 13.1-39.1(b).

PRC argues that because the Cascades West lease transaction cannot withstand the heightened scrutiny required by Virginia law, it was totally within its legal rights when it informed CWA on March 9, 1994, that it was declaring the lease void. PRC asserts that the Court need look no further than PRC's present "dilemma" to find in its favor on the fairness issue. It is presently facing potential liability through December 1995, at above market lease rates, because of Section 31's "onerous" terms. PRC urges the Court to find that the principal officers of ATI, LaRose and Byrd, *inter alia* did not properly investigate potential sites for ATI to locate nor demand that Section 31 be deleted from the lease, because they were willing to sacrifice the future of the corporation in order to assure that they personally would benefit from an equity position in the Cascades West building.

This Court declines to adopt such a myopic analysis of the "fairness" issue, because such an analysis does not consider all of the facts and is contrary to the plain meaning of Va. Code § 13.1-39.1. That section required that a court analyze the fairness issue "in view of all the facts known to any officer or director *at the time* such contract or transaction was entered into on behalf of the corporation." (Emphasis supplied.) A comprehensive review of the relevant facts is therefore necessary for a proper analysis of this issue.

In the late 1970's and early 1980's ATI had only seven voting shareholders: Robert LaRose, Carl Carlson, Girish Jindia, Otto Zipf, Ronald Hobbs, Anthony St. George, and Robert M. Darby. LaRose, CEO of the corporation, owned twenty-five percent of the ATI stock. The evidence at trial clearly showed that LaRose was the principal decision maker at ATI and that the other officers and directors generally followed his lead.

Towards the end of the 1970's, LaRose and others at ATI determined that their office space in Tyson's Corner was rapidly becoming insufficient for the company's growing needs. The company was adding approximately twenty-five people per month to the payroll. LaRose, whom the court found to be a highly credible witness, had a global "vision" for the expansion of ATI. He wanted to locate new office space which would provide room for anticipated expansion, a campus type environment for

the employees, access to Dulles Airport and lease terms acceptable to auditors in the federal government. Most of ATI's contracts with the federal government at that time were cost-reimbursable and therefore ATI's rental payments, if deemed reasonable, would be fully reimbursed by the government. Although most of these contracts were for terms of three to five years, and were not automatically renewable, the atmosphere in the defense industry was highly upbeat as a result of the election of Ronald Reagan in 1980, and the officers of ATI were entirely reasonable in anticipating future growth for the company.

As Tyson's Corner had become too congested, and its lease rates too high, LaRose looked to other areas where the availability of cheaper nearby housing and other amenities such as hiking trails, trees and other natural resources would be attractive to the company's present and prospective employees. The District of Columbia then had a very low vacancy rate for commercial office space and Montgomery County, Maryland, had established a policy of no growth. ATI was looking for a long term home for its headquarters so that the cost and inconvenience of another move could be avoided for at least another fifteen years.

LaRose began to direct his attention to Reston. It was close to Dulles airport, which could be easily accessed once the anticipated toll-road was constructed. Although it was growing residentially, little commercial office space outside of the town-center had yet been constructed. Natural amenities and reasonable housing for employees were in abundance. Discussions commenced with possible developers. LaRose met separately with a representative of Hersand Builders and with Pete Scamardo of the Centennial organization, but no deal could be struck with either of these developers. He then met with Christopher Walker of Dupree District Associates, Inc. Based upon the positive nature of their discussions, LaRose flew to Boston to see some of the buildings that Dupree had constructed and was favorably impressed. As a result, the discussions continued.

As with most defense contractors, the main asset of ATI was its personnel. In the late 1970's one of ATI's key employees had left the company and had taken his contacts with him. Because of this, LaRose was determined to provide sufficient benefits to ATI's key employees so that they would be hesitant to leave the company. At the time, stock options in personal service companies like ATI were not very attractive, because the stock values for similar companies remained low. Other defense contractors were therefore providing equity in their properties to key employees. The then-existing tax laws provided depreciation benefits that most such

key employees could enjoy and such benefits were maximized if the equity was granted to the individuals directly, instead of indirectly through ownership of shares in the corporation. Moreover, if the commercial real estate market flourished, significant appreciation of their equity interests could be attained.

Dupree's proposed project in Reston was also highly compatible with ATI's goals. It was large enough to house four office buildings of 100,000 square feet to accommodate ATI's anticipated growth. The project would have a corner on Reston Parkway, a major thoroughfare through Reston, which would afford easy access to the toll-road to Dulles airport. Most importantly, it could provide the campus-type atmosphere that ATI was attempting to establish.

Negotiations commenced for ATI to lease the entirety of the first building in a complex to be named the Cascades Executive Center. ATI was seeking a term with reasonable rent and an equity position for its officers and directors. Dupree desired a long-term rent-flow commitment, so that it could obtain reasonable financing from a lender and was willing to give up some equity if the particulars of the transaction could be satisfactorily arranged. Massachusetts Mutual became the lender. The officers and directors of ATI formed Regency Limited Partnership (Regency), through which they were to receive their equity interests. The Cascades North lease was executed December 2, 1980. Title to the property was vested thereafter in Cascades North Venture Limited Partnership in which Massachusetts Mutual held a one half interest, Regency held a one third interest and Dupree held the remaining interest. ATI was also granted an option to lease the entirety of the next building to be constructed, the Cascades West building and Massachusetts Mutual was granted an option to finance that transaction.

The Cascades North lease was for an initial term of approximately five and one half years with two five year options. Base rent was calculated at $16.50 per square foot, a rate found reasonable in a study conducted by Coldwell Banker, ATI's real estate agent. However, in section 29 of that lease, ATI agreed that "it shall continue to be obligated for rent due on any space vacant at the end of the lease term unless satisfactory substitute tenancy shall have been arranged." By a document entitled "Amendment Number One to Lease" dated May 5, 1982, this indefinite term was reduced to fourteen years.

The lease for the Cascades North building was ratified at a special meeting of the shareholders of ATI held on February 9, 1981. The resolu-

tion ratifying the lease was approved by each of the voting shareholders of the corporation, either in person or by proxy. The voting shareholders of ATI at that time were Robert LaRose, Girish Jindia, Ronald Hobbs, Otto Zipf, Robert M. Darby, Anthony St. George, and Carl H. Carlson. LaRose, Jindia, Hobbs, and Bronson F. Byrd were the partners of Regency who were to share in the equity in the Cascades North building. The evidence is unclear as to whether Darby and St. George were also limited partners in Regency. The evidence is clear and uncontroverted that not only was the related party transaction issue not hidden from the "disinterested" shareholders, but to the contrary, the "interested" parties sought full shareholder involvement at the meeting. Byrd had requested that Thomas M. Davis, ATI's in-house counsel, research the issue of corporate conflict of interest transactions and Davis had provided a memorandum on the subject in advance of the shareholder meeting. Plaintiff's Exhibit 25. On February 4, 1981, Byrd wrote to Zipf about the meeting and transmitted copies of the lease, the proposed resolution and partnership certificates of Cascades North Associates and Regency. Defendant's Exhibits 37. Darby and St. George were fully aware of the circumstances of this related-party transaction as evidenced by their January 29, 1981, correspondence to Robert Gorham of Wilkes and Artis. Plaintiff's Exhibits 33, 34. St. George was also present at the shareholder meeting. Carl Carlson's proxy appointing Jindia specifically noted that "the Agreement between Cascades North Associates and Adtech, being one in which certain Directors and Officers of Adtech are parties thereto, has been fully disclosed." Plaintiff's Exhibit 36. Nonetheless, he instructed Jindia to vote for ratification. All of the "disinterested shareholders" clearly made an informed decision to ratify the Cascades North lease, including its section 29. The resolution ratifying the Cascades North lease (Plaintiff's Exhibit 40) specifically noted the existence of the personal financial interests of officers and directors of ATI in the Cascades project.

The following additional resolution was also unanimously passed at the February 9, 1981, shareholder meeting:

> be it further resolved, that notwithstanding the fact that certain Officers, Directors and Shareholders of Advanced Technology, Inc., have a financial interest in Cascades, and that certain other Directors and Officers of the corporation may acquire a financial interest in Cascades, or another owner entity of Building II or Building III, that the shareholders hereby specifically empower the Corporation, through the Board of Directors to enter into

> such lease or leases for Building II and Building III, under reasonable terms, that will benefit the Corporation and enhance the consolidation of the corporate facilities.

Plaintiff's Exhibit 39. Building II eventually became the Cascades West building. On January 23, 1981, ATI, Cascades North Associates and Dupree had entered into an Agreement To Lease (Defendant's Exhibit 35) whereby ATI was granted an option to lease the buildings to be constructed in Phases II and III of the Cascades project. On that same day, Regency II[9] had been granted an option to obtain a one-third equity position in the property to be constructed in Phase II, if ATI leased the entirety of the building. Defendant's Exhibit 36.

On February 17, 1981, LaRose circulated a memorandum (Plaintiff's Exhibit 41) to all ATI staff about ATI's "new corporate headquarters." In the memo, he discussed the relocation of the company's headquarters to Reston and advised that the "new office park" would consist of three buildings with buildings two and three to be phased in between 1983 and 1986. It is inconceivable to the Court that Zipf, Carlson and Darby and St. George were not aware of the company's intention to lease more than just the Cascades North building.

On November 20, 1981, Walker wrote to Byrd and advised him that Dupree was going to purchase the land for Phase II. Defendant's Exhibit 40. Pursuant to the January 23, 1981, Agreement granting ATI the option to lease the building to be constructed, Walker set out the proposed closing date and the date by which ATI would have to exercise its option. Walker also began discussions concerning the lease rate for the Phase II building by proposing a rate of $20.35 per square foot. This figure was computed by increasing the base rate for Cascades North by sums to cover (1) inflation, (2) the anticipated higher cost of financing the West building and (3) the cost of amortizing the improvements that ATI wanted included in the West building. Walker concluded by suggesting that if the lender for this aspect of the project required less than a fifty percent equity position, Dupree would be willing to split its increased equity position with Regency.

In response to Walker's correspondence, Byrd forwarded a memo on November 30, 1981, to Donald Caruthers, ATI's outside counsel, Davis, ATI's in-house counsel, and Ronald J. Slusher and John S. Zeigler, two of

---

[9] In late 1980, Regency II had been formed as successor to Regency.

ATI's key facilities personnel. In that memo, (Plaintiff's Exhibit 45) Walker urged these individuals to undertake an in-depth evaluation of each clause of the Cascades North lease. Neither Caruthers, Davis, Slusher, or Zeigler ever owned an equity interest in either of the Cascades buildings.

The goals of ATI and Dupree in a lease for the Cascades West building were different. Walker was then searching for a lender to finance Phase II and was seeking to obtain the longest possible cash-flow stream at the highest possible rent in order to obtain the best possible financing package from a lender. ATI was seeking a lease compatible with the terms of the Cascades North lease, so that it could expand into an additional facility at the Cascades complex at the earliest reasonable opportunity. As it was continuing to expand, ATI needed not only more offices but also a data center, an auditorium, a classroom, laboratories, and meeting facilities. It sought to have the Phase II building built to meet its specific needs without an expenditure of the capital to pay for these "tenant options." If the cost could be amortized over the course of the lease, the federal government would probably wind up paying these costs as long as DCAA determined that the lease rate was reasonable. Byrd directed Slusher to work with some real estate brokers to determine the reasonable rental rate range for the property. Byrd was eventually advised that the range extended up to twenty dollars per square foot.[10] ATI had already committed to placing its headquarters at the Cascades Center for, at the very least, the ensuing seven years and the length of the lease term for the Cascades West building was therefore not as important as it otherwise might have been.

The primary officers and directors of ATI had also decided to offer equity in Cascades West to other key personnel of ATI in an effort to maintain their key personnel and to potentially attract others. They decided to establish another limited partnership (Regency III) through which equity positions would be granted to key employees, with the equity position being subject to re-purchase, in the discretion of the general partner, if the employee left ATI.

Byrd, Caruthers, Slusher, and Zeigler met on December 8, 1981, to discuss potential terms for a Phase II building lease. Caruthers recommended that section 29 of the North lease be deleted from the lease for the Cascades West building. Plaintiff's Exhibit 46. After the meeting, at Byrd's direction, Caruthers drafted proposed lease revisions which deleted section

---

[10] This testimony was admitted for the limited purpose of establishing the information that was known to ATI at the time of the execution of Cascades West lease.

29 in its entirety. Plaintiff's Exhibit 48. On January 12, 1982, Byrd and Caruthers met with Walker to discuss potential lease terms. Walker demanded that section 29 be included in the Cascades West lease. In his mind, a long-term cash-flow commitment was crucial to his ability to obtain favorable financing. In addition, he believed it was not reasonable for him to give up equity in the property to key employees of the tenant, unless a long-term lease was signed. Walker wanted a fifteen year rent guarantee. Byrd and Caruthers wanted the open-ended rent guarantee from the Cascades North lease modified. This guaranty issue was clearly a *subject of negotiations between the parties. Byrd requested that Caruthers draft a new provision, reducing the rent guarantee period to twelve years,* and incorporating other modifications consistent with Caruthers' January 13, 1982, correspondence to him. The language drafted by Caruthers was accepted by Walker and the parties also eventually agreed on a basic lease rate of $19.75 per square foot.

On August 27, 1982, the Cascades West lease between Cascades West Associates, a Virginia Limited Partnership, landlord, and ATI, tenant, was executed. The lease term was to commence December 15, 1983, with the initial term ending March 15, 1989. ATI was granted two five year options. Section 31 obligated ATI to guarantee lease payments consistent with the terms of the lease through December 15, 1995, or such earlier time as it supplied a "satisfactory substitute tenant."

In November 1982, certificates of limited partnership for Regency III Limited Partnership were filed with the clerk of the Fairfax County Circuit Court. Plaintiff's Exhibits 4a and 4b. LaRose was listed as the general partner, and Byrd was listed as the limited partner. On June 24, 1983, prior to the commencement date of the Cascades West lease, the Regency Investments III Limited Partnership Agreement was executed by LaRose as general partner and by twenty-four limited partners. Plaintiff's Exhibit 4. All twenty-four of the limited partners were either employed by or provided services to ATI. Other key employees of ATI were also subsequently offered interests in Regency III. See Plaintiff's Exhibit 63. LaRose initially obtained a two percent interest in Regency III at a time when he owned twenty-five percent of the capital stock of ATI. Jindia obtained a three percent interest in Regency III when he owned eleven percent of the ATI shares. Byrd received an eight percent interest in Regency III. Darby, Hobbs, and St. George obtained three percent interests in Regency III.

The Regency III Agreement gave LaRose, as general partner, the right to dispose of the shares of a limited partner who ceased to be employed or associated with ATI as follows:

> If a Limited Partner, who, upon execution of this Agreement, is currently employed by Advanced Technology, Inc., a Virginia Corporation, ceases to be employed or associated with Advanced Technology, Inc., or any of its subsidiaries, for any reason other than death, retirement (as defined by said employee becoming 55 years or older), incapacitation or adjudication of insanity, the General Partner may, in his sole discretion at any time thereafter, purchase and redeem said Limited Partnership interest and the Limited Partnership agrees to sell and transfer said interest for a purchase price equal to (a) the capital account of the terminated Partner or, (b) if the such capital account is negative, equal to One Hundred Dollars ($100.00), and by releasing the withdrawing Partner from any and all liabilities he may have with respect to Partnership obligations; such consideration shall be considered full payment in exchange for such interest. The parties hereto acknowledge that such payments may bear no correlation to the fair market value of their interest at such time or to their resulting tax liability, and hereby accept this provision as a condition to this Agreement.

Many of the initial limited partners no longer own interests in Regency III. LaRose's interest in the partnership has risen to 23%.

On September 29, 1983, the shareholders of ATI unanimously ratified all actions taken by the Board of Directors for the year June 1, 1982, to May 31, 1983, the time frame in which the Cascades West lease was executed.

In asserting that the Cascades West lease was not fair to the corporation at the time of its execution, PRC argues *inter alia*: (1) that ATI could have obtained the same or a better deal without a rent guarantee obligation; (2) that LaRose and Byrd did not fully investigate potential sites for the headquarters before choosing the Cascades Executive Center project; (3) that LaRose and Byrd did not properly investigate the anticipated market rental rates as of 1989 and thereafter, before agreeing to inclusion of section 31; and (4) that the "interested" officers of ATI were motivated not by the best interests of the corporation but by their own self-interests and agreed to

the inclusion of section 31 in the lease so that they could obtain their equity interests in the Cascades West property.

PRC's first three arguments attempt to impose on the directors of PRC a burden higher than that required by law. One need not obtain the best possible deal in order to satisfy the "fairness" test under former § 13.1-39.1 of the Code. The test is whether the deal eventually effected "carries the earmarks of an arm's length bargain." *Pepper v. Litton*, 308 U.S. at 306-7. The analysis must also be conducted in light of the circumstances then known to the officers and directors, not those conceived during litigation, years later.

At the time of the execution of the Cascades West lease, ATI had already committed to the Cascades Executive Center project by entering into the Cascades North lease. The decision to enter into the Cascades North lease had been made during a period when ATI was rapidly expanding, needed greater space and was searching for a long-term headquarters. The marketplace was limited for the type of environment that ATI's directors wanted to establish. Inflation was high and lease rates were continuing to spiral upwards. Timing was crucial, so that ATI could sustain or increase its pattern of growth during the anticipated Reagan defense buildup. The Cascades Executive Center project offered ATI everything that it was looking for as a home for its headquarters. Other potential sites had been investigated. Studies had been conducted to assure that DCAA would approve the lease rates and the federal government did in fact pay the Cascades West rent for years after the lease was executed. PRC's argument that anticipated rental rates for the period 1989 and thereafter should have been better investigated presupposes that such an investigation would have divulged information contrary to ATI's best interests. As PRC did not present any evidence that such an investigation would have divulged an anticipated decrease in the prevailing lease rates commencing in that time frame, this Court must conclude that no such evidence would have been available to ATI's officers in the 1980-1982 time frame.

The inclusion of section 31 in the Cascades West lease does not alter the Court's conclusion on the "fairness" issue. This provision was the subject of actual arms-length negotiations between a landlord who wanted the longest possible rent-stream guaranteed and a tenant who wanted equity in the project as an inducement to its key employees to stay on board while ATI continued to grow. A much more onerous provision in the Cascades North lease had been unanimously ratified by the voting shareholders of ATI, after disclosure had been made of the interest of the Regency part-

ners. As set out later in this opinion letter, this Court considers the Cascades West lease equivalent to a twelve year lease with an option for an additional three years; with the tenant having the ability to absolve itself of any potential liability after five and one-half years, if it could find a sublessee acceptable to the landlord. As PRC had itself entered into a fifteen year lease during the 1970's, its argument on this issue is unpersuasive.

The Court must finally address PRC's position that section 31 was included in the lease as the *quid pro quo* for the equity in the property obtained from the landlord. This Court does not question that LaRose, Byrd, and Jindia may have been thinking of their own self-interests, in part, when the Cascades West lease was executed. The Court is aware that our Supreme Court has never wavered from the position that a corporation is a legal entity separate and distinct from its shareholders. *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (1979); *Peoples Pleasure P. Co. v. Rohleder*, 109 Va. 439, 446 (1909). However, corporations are not born. They are formed by people to accomplish their shareholders' goals. *See Addison and Blythe v. Lewis*, 75 Va. 701, 720 (1881) (management of corporation represents "the aggregate interests of all the stockholders"). The voting shareholders had unanimously informed LaRose and Byrd in advance of August 27, 1982, that they fully embraced the concept of ATI establishing the Cascades Executive Center as the company's new headquarters and the risks which were attendant to it. Knowing that the principal decision makers in the corporation stood to personally gain from this project, they unanimously endorsed LaRose's vision for the company. No evidence was presented at trial that any of ATI's then existing shareholders ever questioned or complained about the Cascades West lease. Their confidence in LaRose's vision was rewarded when their interests in the company's stock, which had cost them less than one million dollars in 1976, were purchased for over one hundred forty million dollars approximately twelve years later.

The Supreme Court has defined clear and convincing evidence as "that measure of degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." It is an intermediate level of proof, more that a mere preponderance but less than proof beyond a reasonable doubt. *Southeastern Tidewater Opportunity Project, Inc. v. Bade*, 246 Va. 373, 276 (1993) citing *Oberbroeckling v. Lyle*, 234 Va. 373, 379 (1987); *Fred Walker Agency, Inc. v. Lucas*, 215 Va. 535, 540-41 (1975). This Court finds the evidence clear and convincing that the Cascades West lease was fair and

reasonable to ATI at the time it was executed and therefore PRC may not now have it declared void pursuant to § 13.1-39.1 of the Virginia Code.

PRC's additional argument that the analysis of this issue should be significantly affected by LaRose and Byrd's ownership of 100% of the interests in Regency III at the time of the execution of the Cascades West lease is not persuasive. The Court finds the evidence clear and convincing that LaRose fully intended at that time, to transfer the bulk of the limited partnership's interest to ATI's key employees. If he had not, he could have been sued for breach of his fiduciary duties to ATI.

### III. *Waiver, Estoppel, and Ratification*

The lines delineating the scope of the doctrines of waiver, estoppel, and ratification have sometimes overlapped in the Virginia Supreme Court's decisions. Compare *Employers Ins. Co. v. Great American*, 214 Va. 410, 412-13 (1973) (in waiver, intent to relinquish right is an essential element) with *Dobie v. Sears, Roebuck and Co.*, 164 Va. 464, 470 (1935) (if after discovery of facts entitling a party to rescind, a contract is treated as subsisting, the right to rescind will be deemed waived). Assuming, without deciding, that the doctrine of waiver requires clear and convincing proof of an intent to relinquish the right, the evidence is still clear and convincing that PRC should be estopped from attempting to void the Cascades West lease because of the tenant's acceptance of the benefits of the lease for twelve years and its ratification of its terms.

Even if the Court were to rule that sufficient ratification of the Cascades West lease had not taken place at the September 29, 1983, meeting of ATI's shareholders to preclude PRC's § 13.1-39.1 argument, the evidence would still establish that PRC and its predecessors ratified the Cascades West lease on a number of occasions after the "interested" directors were no longer directing the affairs of the company. PRC claims that neither it nor any of its predecessors arising out of the January 1, 1988, merger of ATI with Emhart can be charged with knowledge of the existence of section 31, until the summer of 1992, when one of PRC's officers read it. This position is contrary to established Virginia law and the facts in this case. This Court finds it difficult, at best, to believe that nobody from Emhart read the Cascades West lease during the due diligence process leading up to the January 1, 1988, merger. Byrd had specifically advised general counsel for Emhart that the Cascades North and West leases were related party transactions. Plaintiff's Exhibit 83. (The Court is unconvinced that alleged misrepresentations in the financial documents pre-

vented discovery of the existence of section 31.) In addition, both Tom Davis and Ron Slusher became key employees under the new management after the January 1988 merger and both rose to the level of vice president at PRC before leaving the company. They each had knowledge of the Cascades West lease dating back to its negotiation and execution in 1982. When the merger occurred in 1988, the files containing the Cascades West lease remained in ATI's Reston facility and were moved to a McLean facility of PRC in 1990, when Slusher and the real estate section were relocated. The Cascades West lease was in the proper file in June 1992 when Slusher remembers reading it. Although the knowledge of interested directors cannot be imputed to a corporation, *Coronado-Inglenook Co. v. Black*, 198 Va. 772, 776 (1957); *Nat. Bank of Suffolk v. Am. Bank and Trust Co.*, 163 Va. 710, 713 (1934), neither Davis nor Slusher were partners in Regency III or otherwise "interested" persons. Their loyalty was to the corporation both *before* and after the merger. This Court rejects any implication that Davis ever knowingly violated his fiduciary duty to ATI out of deference to the requests of either LaRose or Byrd.

In February 1988, after the Emhart personnel had assumed control of ATI, the first five year option was exercised without any objection as to the terms of the lease. In March 1989, a First Amendment to Lease of Cascades West Building was executed which stated in Section 2 that "[in] all other respects all terms and conditions of the Lease shall remain unchanged and in full force and effect." Plaintiff's Exhibit 2. In August 1991 PRC itself entered into a Second Amendment to Lease which reduced the monthly rent by almost eleven thousand dollars and which contained an identical section reaffirming that the Cascades West lease was in full force and effect. Plaintiff's Exhibit 2. This Second Amendment was executed by Slusher as Vice President of PRC. Although Slusher acknowledged reading the Cascades West lease in June 1992 and discussing its contents with Michael Kelly, Director of Corporate Real Estate shortly thereafter, PRC never advised CWA of its intention not to honor section 31's terms until February 1993. It was not until over an additional year later, on March 9, 1994, that PRC first articulated the position that it had the right to void the Cascades West lease.

> As a general principle, one who accepts a written agreement or contract is presumed to know and assent to its contents. In addition, it is hornbook law that one who [signs] a written contract will normally be bound by its terms and [that] ignorance . . . of

the terms will not ordinarily affect the liability of such person under the contract.

*Mueller v. Commonwealth*, 15 Va. App. 649, 654 (1993) quoting *Simmons v. Peoples Bank*, 27 B.R. 508, 510 (Bankr. W. D. Va. 1983). *See also Ashby v. Dumouchelle*, 185 Va. 724 (1946).

PRC was clearly chargeable with knowledge of the contents of section 31 long before Slusher executed the Second Amendment to Lease on its behalf. That document was executed well after all of the "interested" ATI officers had left the company. At that time, PRC again affirmed the validity of the Cascades West lease and continued to occupy the leased premises for the entirety of the first option term before asserting that the lease was void.

PRC argues that the Virginia Code sets out the sole manner in which a related party corporate transaction can be ratified. The Court disagrees. Where, as here, a successor to the original corporation accepts the benefits from and reaffirms the validity of a related party transaction after all of the "interested parties" have left the corporation, this Court holds that the successor corporation is estopped by ratification from asserting that the transaction is void. Under *these circumstances*, more traditional principles of ratification should be applicable. *Cf. Link Assoc. v. Jefferson Standard*, 223 Va. 479, 484-85 (1982) ("A party intending to repudiate a contract on the ground of fraud must act within a reasonable time and with great punctuality upon learning of the wrong. He will be deemed to have waived his right of repudiation if, after discovery of the fraud, he treats the contract as a subsisting obligation."); *Brewer v. Bank of Danville*, 202 Va. 807, 814 (1961) (holding that "the action on the part of the corporation, in making payments for so long a period without objection, constituted a ratification of the agreement by the corporation."); *A.I.M. Percolating Corp. v. Ferrodine Chem. Corp.*, 139 Va. 366, 374 (1924) (holding that even though certain corporate formalities had not been complied with in the execution of the subject contract, the corporation had "knowledge of the existence of the contract," and "treated it as a valid and binding contract," and thus ratified the contract by accepting the benefits thereunder); *Webb v. Duvall*, 11 A.2d 446, 448 (Md. 1940) ("where an irregular act is later ratified by the corporation in one of several ways, among them being acceptance of the benefit derived from the transaction and consequent acquiescence therein" an exception is recognized to the general rule requiring a corporation to act properly through its officers. "Many of the courts regard the acceptance of the benefit as a ratification of the authority,

where such authority is originally doubtful, defective or wanting.") CWA paid Regency III approximately 4.8 million dollars during the term of the Cascades West lease. As the general partner of CWA was not an "interested party" in ATI, it cannot be seriously argued that the landlord did not change its position based upon the tenant's acceptance of the lease throughout the initial term and the first option term. *See Employers Ins. Co. v. Great American*, 214 Va. 410 at 412 (1973). PRC's position that it validly voided the Cascades West lease must therefore fail for this additional reason.

## IV. *Section 31 As An Unenforceable Penalty*

PRC further argues that section 31 of the Cascades West lease constitutes an impermissible penalty provision which this Court should declare unenforceable. In support of its position, PRC relies *inter alia* on the Supreme Court's decisions in *Dahlgren Ltd. Partnership v. Board of Supervisors*, 240 Va. 200, 202-3 (1990), and *Taylor v. Sanders*, 233 Va. 73, 75 (1987). These cases are inapposite. They pertain to purported liquidated damage provisions effective upon a breach of the contract. Section 31 is not a provision which is effective only upon a breach, nor is it intended to establish the damages or penalty arising from a breach. It is a rent guaranty provision that assures the landlord that this tenant will be liable for at least twelve years of lease payments at the agreed upon rate unless a "satisfactory substitute tenancy" has been arranged and the substitute tenant has commenced paying rent. This provision arose out of negotiations between the landlord and the tenant, after Walker refused ATI's request to have this provision deleted from the Cascades West lease. Revisions to section 29 of the Cascades North lease were negotiated and the revised provision was drafted by Caruthers, ATI's counsel, who remained opposed to the provision. Caruthers proposed section 31 was acceptable to the landlord. It is the duty of a court to enforce the terms of a contract agreed to by the parties, not to redraft the contract in a manner which the court may find more reasonable. *Blunt v. Lentz*, 241 Va. 547, 551 (1991); *Great Falls Hardware v. South Lakes Village Ctr.*, 238 Va. 123, 125 (1989).

This Court also rejects PRC's argument that section 31 constitutes a penalty because it potentially requires the tenant to pay rent when it would have no right to occupy the premises. Even if there were authority to support the proposition that such a construction of this lease term could constitute an impermissible penalty, such a construction of section 31 cannot be justified. PRC correctly argues that the landlord herein had a

duty to mitigate its damages if the tenant vacated the property at the conclusion of either the original term or the first option term of the Cascades West lease. As long as the tenant was current on its payments through the initial term, and, if applicable, the first option term, it would not have abandoned the leased property before the expiration of the lease term. Therefore, the narrow exception to a party's duty to mitigate damages, which the Supreme Court carved out in *Crowder v. Virginia Bank of Commerce*, 127 Va. 299 (1920), would not be applicable. *See Hannan v. Dusch*, 154 Va. 356, 377 (1930), which limited the holding in *Crowder* and recognized that in certain circumstances the duty to mitigate is applicable between landlord and tenant. As a result, unless a suitable substitute tenancy had been arranged relieving the tenant of any future potential liability, any effort to force the tenant from the premises during the twelve year rent guaranty period, at a time that the tenant was willing to pay the full rent, would violate the mitigation requirement and the tenant would thereby be absolved of any liability. Moreover, subsection (b) of the provision granted the tenant the right to reject any proposed substitute tenant, who sought to pay less than the full rent under Section 4 and 5 of the lease. PRC's novel "penalty" argument is neither supported by any Virginia authority nor consistent with the terms of the Cascades West lease. Accordingly, it is rejected by this Court.

### V. *Claim of Release Under Section 31*

PRC next claims that CWA accepted PRC as a "satisfactory substitute tenant" under section 31 and that once PRC paid at least one month's full rent thereafter, it was relieved of any further liability pursuant to the terms of the lease.

The Court finds the terms of section 31 of the Cascades West Lease to be ambiguous. Consequently, in order to determine the parties' intended meaning for this provision, the Court must consider the testimony of the parties at trial. *Cascades North Venture Limited Partnership v. PRC, Inc.*, 249 Va. 574 (1995); *The Anden Group v. Leesburg Joint Venture*, 237 Va. 453, 458 (1989). The words used by the parties in the contract must also be considered in determining their intent and should be given their ordinary meaning. *Winn v. Aleda Const. Co.*, 227 Va. 304, 307 (1984). If the intent of the parties cannot be determined by the words used or the evidence adduced at trial, then the ambiguities in the document should be interpreted against the party who drafted it. *Id.* at 307. Section 31 of the

Cascades West lease was drafted by Donald Caruthers, counsel for the tenant.

The first paragraph of Section 31 provides that the tenant shall remain obligated for the rent "unless satisfactory substitute tenancy shall have been *arranged* and such satisfactory tenant shall have commenced paying rent." (Emphasis added.) *Websters Ninth New Collegiate Dictionary* defines arrange, *inter alia*, as "to bring about an agreement or understanding concerning: settle . . . ." A meeting of the minds of the parties is therefore a necessary predicate to arranging a substitute tenancy.

The evidence adduced at trial belies any argument that there was ever a meeting of the minds to create a substitute tenancy under section 31. On February 19, 1993, Michael Kelly, director of corporate real estate for PRC, wrote to Walker (Plaintiff's Exhibit 101) and asserted that PRC was not liable for any rent after the expiration of the first option term of the Cascades North and Cascades West leases, unless the second option was exercised. On March 9, 1994, Kelly again wrote to Walker (Plaintiff's Exhibit 106) and declared that the Cascades West lease was void effective March 15, 1994. That same day Kelly forwarded an additional letter to Walker (Plaintiff's Exhibit 107) advising him that PRC would not be vacating the Cascades West building on March 15, 1994, and was declaring itself a *common law* holdover tenant. He went on to state that although PRC was tendering an amount of rent consistent with the terms of the Cascades West lease, "that is being done as an interim measure pending a determination of the fair market rent for the premises during the holdover period. PRC *reserves the right to seek a refund* for the difference between the payments made during the holdover and the actual fair market rent for the period." (Emphasis supplied.) These March 9, 1994, letters voiding the lease, asserting a common law holdover status and declaring an intention not to pay the "Basic Rent" required by section 31, are all totally inconsistent with PRC's present position that a satisfactory substitute tenancy was created on or after March 15, 1994. Patrick Fizpatrick's July 11, 1994, correspondence to Walker (Plaintiff's Exhibit 111) is also entirely inconsistent with PRC's position. In that letter, Fitzpatrick reasserted that the Cascades West lease was void "and had been so since mid-March." Therefore, none of the full payments of basic rent made between March and June 1994, were made with the intention of creating a substitute tenancy.

PRC's own pleadings in this case are inconsistent with its present position. On July 29, 1994, PRC filed its Amended Grounds of Defense. In that pleading, it added a Fifth Defense of failure to mitigate damages.

Rather than asserting the creation of a satisfactory substitute tenancy which constituted an accord and satisfaction or release, PRC was then alleging that CWA had failed to mitigate its damages. If in fact PRC had truly believed at that time that it had been completely relieved of its responsibility to make any further lease payments because of the creation of a substitute tenancy, there would have been no reason to then allege for the first time that CWA had failed to mitigate its damages. There is no evidence that PRC ever asserted its substitute tenancy position at any time before it filed its trial brief in December 1994.

PRC nonetheless argues that Walker's statement during his deposition that "we regarded them as a satisfactory substitute tenant, but they are not paying the rent, the full rent;" and Walker's March 25, 1994, correspondence to Peter Johnson of PRC (Plaintiff's Exhibit 108) establish the existence of a substitute tenancy under section 31. The Court disagrees. The Court interprets Walker's statement, in the context of all the evidence in this case, as an acknowledgment that PRC could qualify as a satisfactory substitute tenant and that as long as PRC was paying the full rent, CWA was satisfied to allow it to continue to occupy the Cascades West building. Such an interpretation is entirely consistent with Walker's trial testimony and his correspondence to the PRC personnel. Plaintiff's Exhibits 108, 110, 112, and 114. In those letters, Walker made it clear that the landlord was treating PRC as a holdover tenant pursuant to section 18 of the Cascades West lease, rather than as a tenant in a substitute tenancy. The lengthening of the time for giving notice of the termination of the holdover tenancy is also immaterial. Walker's March 25, 1994, correspondence makes it clear that he was simply extending the time for giving notice pursuant to section 18 of the lease. His statement that the additional thirty days "will give both parties adequate time to prepare for the termination of the holdover period and *PRC to vacate*," (emphasis added) is convincing evidence that this change was not intended to be an agreement to create a substitute tenancy.

Based on the wording of section 31, the correspondence between the parties, the testimony at trial, and the pleadings of the parties, this Court finds by a preponderance of the evidence that no satisfactory substitute tenancy was ever arranged between the parties as contemplated by section 31 of the Cascades West lease. Consequently, the payment of full rent by PRC as a holdover tenant between March and June 1994 does not relieve it of its obligations under section 31 of the lease.

## VI. *Mitigation of Damages*

PRC's final argument is that CWA failed to properly mitigate its damages and therefore cannot recover the sums claimed in this lawsuit. This argument is also unavailing.

Inherent in the general rule creating a duty to mitigate damages is that the mitigatory actions required of the plaintiff are qualified by reasonableness. *Hannan v. Dusch*, 154 Va. 356 (1930). The plaintiff is not imposed with the hardship of seeking every possible way to mitigate damages for the benefit of the defendant, but rather is only required to "use ordinary efforts and reasonable expenditure" to minimize damages when it can be done with "trifling expense and with reasonable exertion." *Rosenberg v. Stone*, 160 Va. 381, 386 (1933). The burden is entirely on the defendant to prove that a plaintiff has not adequately mitigated its damages. *Stohlman v. S and B Ltd. Partnership*, 249 Va. 251 (1995); *Foreman v. E. Caligari and Co.*, 204 Va. 284, 290 (1963).

PRC alleges that CWA breached its duty to mitigate damages because there may have been some actions that the Plaintiff could possibly have taken, but did not, to increase the chances of obtaining a lessee for the Cascades West building. The Defendant further alleges that the Plaintiff promoted its own business interests in attempting to lease the Cascades North building before the Cascades West building. The evidence demonstrated, however, that plaintiff took reasonable and affirmative efforts to minimize its losses by marketing the property through a broker, advertisements, mailings, promotional breakfasts, and signage. The plaintiff promoted the availability of the property once it became aware of the Defendant's intention not to honor section 31 and marketed the property in a manner consistent with its efforts to lease its other properties. As the Cascades North building was vacant and was not generating any income, CWA was under no duty to attempt to find a new tenant for the Cascades West building before the Cascades North building. Therefore, the defendant failed to meet its initial burden of proving by a preponderance of the evidence that the plaintiff did not undertake reasonable efforts to mitigate its damages.

The burden of proof in the affirmative defense of failure to mitigate damages also includes a second tier. The Defendant has the burden of proving the amount by which the plaintiff's damages increased as a result of the breach. *See Richmond v. Cheatwood*, 130 Va. 76, 88 (1924); Virginia Model Jury Instructions, Sec. 45.550 (Michie Co. 1993). At trial, the Defendant produced no evidence that there was a substitute tenant avail-

able that was rebuffed, or at a minimum, not encouraged. The Defendant failed to specify how the Plaintiff's alleged failure to mitigate damages could be converted into a calculation of actual monetary amounts by which the claimed damages should be reduced; nor did the evidence give the Court any reason to believe that the Plaintiff passively incurred losses which it reasonably could have avoided. Therefore, the Defendant also failed to meet this second tier of its burden to prove a failure to mitigate damages, and this affirmative defense is rejected.

## VII. *Conclusion*

For the reasons set forth in this letter opinion, the Court grants Cascades West Associates a declaratory judgment that the Cascades West lease is still valid and in full force and effect. The Court further grants Cascades West Associates a judgment against PRC, Inc., in the sum of $180,000 for the rent due from July 1994 through December 1994, attorneys' fees in the stipulated sum of $225,000, transcript fees as agreed to between counsel for the parties, the expert witness fees of Warren Hannan and Steven Bierman, which the court found reasonable, $2,789.00 in consequential damages,[11] and the plaintiff's costs expended herein.

---

[11] The Court awards all of the advertising and marketing expenses set out in Plaintiff's Exhibit 117. The leasing broker expenses claimed are not awarded as the testimony of Clark Rheinstein did not establish, by a preponderance of the evidence, that portion of the total broker expense which was truly allocable to the Cascades West property.